No. 44,291

STATE OF KANSAS, *Appellee*, v. WILLIAM FREDERICK ZIMMER,
*Appellant*.

(426 P. 2d 267)

Opinion filed April 8, 1967.

*Elwaine F. Pomeroy*, of Topeka, argued the cause, and *Emerson M. Pomeroy*, of Topeka, was with him on the brief for the appellant.

*Robert D. Hecht*, county attorney, argued the cause, and *Robert C. Londerholm*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: William Frederick Zimmer was convicted of the offenses of kidnaping in the first degree, with harm inflicted (K. S. A. 21-449) and of murder in the first degree (K. S. A. 21-401). As punishment the jury imposed the death penalty for the kidnaping charge and life imprisonment for the murder. The trial court denied appellant's motion for new trial, and adjudged sentences in accordance with the jury verdict, from which defendant Zimmer has appealed.

The charges grow out of the abduction and slaying of Gladys Cora Johnson, a Negro girl aged seven years.

Appellant Zimmer's contentions of error will, so far as practicable, be dealt with chronologically.

The first contention is based on the failure to appoint counsel for appellant during a particular period of time. To avoid possible misunderstanding in this area, certain background facts should be stated although all are not directly pertinent to the precise error asserted.

The offenses allegedly occurred on Saturday, November 14, 1964. Appellant, forty years of age, a resident of Kansas City, Kansas, was arrested about 9:00 p. m. on Sunday, November 15, at Marysville,

Kansas. At the time of this initial apprehension he was advised by an agent of the Federal Bureau of Investigation of his right to have the services of an attorney and to consult with anyone else he chose. He indicated his understanding of his rights and no complaint is made as to the character of advice given. Later the same night and prior to the time he was brought by police to Topeka appellant told his brother-in-law, a resident of Marysville, to call appellant's wife and have her get a lawyer for him. Appellant was brought to Topeka the early morning of Monday, November 16. On the same day while in jail in Topeka, he was consulted by an attorney from Kansas City, Kansas. It appears this consultation was the result of the request relayed to his wife.

On November 19 the judge of the city court of Topeka, the examining magistrate upon the charges filed, in accordance with custom in Shawnee county in all felony cases, appointed Mr. Sam Crow, a practicing attorney at Topeka, counsel for appellant. This appointment was for the purpose of preliminary examination which was held November 25, at the conclusion of which appellant was bound over for trial to the district court of Shawnee county. On December 21 appellant filed in the latter court an application for the appointment of an attorney. This instruments was as follows:

"APPLICATION FOR APPOINTMENT
OF COUNSEL

"Comes now the defendant and applies to the Court for the appointment of counsel to represent him in the District Court of Shawnee County, Kansas."

On December 23 Mr. Crow was appointed by the district court to represent appellant upon the hearing of the application. Hearing was held December 29 before the judge of the division then in charge of the criminal docket. At the hearing appellant offered no evidence in support of his application, choosing to rely on the written request. The district court then directed that appellant be examined under oath by the prosecution, which was done. In substance appellant testified he was employed as an engineer by the Union Pacific Railroad Company at a gross salary of about $300.00 every two weeks; that his wife was employed by the same company at a salary of about $400.00 per month; that he owned jointly with his wife his home in Kansas City, Kansas, of a value of about $10,000, furniture, and a 1954 Plymouth, and that his wife owned a 1958 Volkswagen, all free of indebtedness; that he had approximately $2,000.00 on deposit with the railroad credit union, about

$800.00 in a bank account, and government bonds in an amount between $250.00 and $500.00; that after these criminal charges were filed he gave a power of attorney to his wife permitting her to transfer title to the property; he testified he did not know what the purpose of any transfer was, that his wife "asked for my cooperation on it and that's what I did."

Appellant further testified he had not contacted any attorney and no attorney had refused to represent him. The prosecution introduced income tax records showing that for the year 1962 appellant had wages of $9,360.24 and his wife $5,154.80, and for the year 1963 appellant had wages of $8,448.74 and his wife $5,137.40.

Based upon the foregoing the court found appellant was not indigent and was able to employ counsel of his own choosing, that appellant had made no effort to employ counsel and there was no evidence any counsel had refused employment, and the court on December 3, 1964, denied appellant's application.

Although the record proper does not so disclose, we are advised by the prosecution in its brief, and it is not controverted, that on the next day, following this decision appellant's wife filed suit in district court of Wyandotte county, Kansas, against appellant asking for divorce and division of property; the county attorney of Shawnee county attempted to intervene in the divorce action for the purpose of having a portion of the marital property set aside to defray the expense of appellant's defense in this case; this attempted intervention was denied.

Commencing with the January, 1965, term of court the judge of the second division of the Shawnee county district court assumed charge of the criminal docket and subsequent proceedings herein have been in that division.

On January 25, 1965, the court appointed a commission of three doctors to examine appellant's mental condition. On January 28, 1965, the commission reported it found appellant "not insane, an idiot, and/or an imbecile and is in our opinion able to comprehend his position and make his defense in the cause now in hearing."

On February 2, 1965, the court held a hearing on its own motion to determine whether counsel should be appointed to represent appellant. The court found appellant did not have counsel of his own choosing and had not employed counsel and further, that appellant had advised the court he did not intend to employ counsel. Thereupon the court appointed as counsel for appellant

Mr. Elwaine F. Pomeroy, a practicing attorney at Topeka. Trial commenced March 15, 1965.

As stated, appellant filed his request for the appointment of counsel December 21, 1964; the initial application was denied and it was not until February 2, 1965, that counsel was appointed for him. It is upon the December failure to appoint counsel and the consequent absence thereof during this six week period that appellant bases his first contention of error. He asserts he was entitled to assistance of counsel at every stage of the proceedings and that this right was denied him during the period between December 21, 1964, and February 2, 1965.

There is no question under both our state and federal constitutions as to the entitlement of one accused of crime to the effective assistance of counsel in his defense. It is now well established this entitlement extends to every critical stage in a criminal proceeding where there may be a substantial loss of advantage to the defendant, and it may not be denied one who because of indigency is unable to employ counsel. This right may be waived, provided the waiver is made voluntarily, intelligently and knowingly.

We are aware of no authority for the appointment of counsel at state expense for one financially able to employ counsel absent other compelling reasons. Our statute (K. S. A. 62-1304) makes provision for such appointment only if the accused be not able to employ counsel. It expressly authorizes withdrawal of court-appointed counsel upon knowledge that the accused or his relatives or friends are able to employ counsel. Implicitly, where financial ability is concerned, our decisions have limited the benefits of the statute to indigents.

Our statute for appointment of counsel is similar to Rule 44 of the Federal Rules of Criminal Procedure. In administering this rule the federal courts have held one who is financially able to employ counsel is not entitled to have counsel assigned by the court (see 4 Barron Federal Practice & Procedure, Rules Edition, § 2461).

Appellant was of mature age, competent, with full opportunity to contact counsel, it is not contended otherwise), and he had substantial monetary resources. The guarded nature of his written application for counsel is patent, no reason being given for the request.

We would not undertake to prescribe financial standards of eligibility for appointment of counsel which would be applicable to all offenses in all districts under all conditions. These might

well vary dependent upon the particular circumstances. Suffice it to say here we think the trial court in December acted properly in refusing to appoint counsel upon the showing made. Appellant argues if counsel should have been appointed in February, counsel should have been appointed in December. This does not necessarily follow. Appellant was shown not to be an indigent in December—the record contains no showing on the subject in February and the propriety of that appointment is not an issue.

It should be noted this was not a request for counsel made before an interrogation phase of a criminal proceeding where the relationship of the financial condition of an accused to the scope of the right involved might be questioned. Nor is there any showing that in the interim period when appellant was without counsel there was any critical proceeding had, plea taken, incriminating statement made or defense lost, or of prejudice of rights in any way. Appellant merely speculates something more favorable to him might have developed had he had an attorney. Nor does the fact that a sanity commission was appointed and acted during the interim when appellant was without counsel present any basis for relief (*State v. Andrews*, 187 Kan. 458, 357 P. 2d 739, cert. den. 368 U. S. 868, 7 L. ed. 2d 65, 82 S. Ct. 80). This contention of error may not be upheld (see *State v. Lee*, 197 Kan. 463, 419 P. 2d 927, cert. den. 386 U. S. 925, 17 L. ed. 2d 797, 87 S. Ct. 900).

Appellant's next contention of error involves a pill taken from him by police officers at the time of his arrest and which came into custody of the Kansas Bureau of Investigation. Allegedly the pill was of a type appellant had procured from a layman at his employer's first-aid station and which he had been taking for the purpose of curbing his appetite in a weight reduction effort. On March 9, 1965, appellant's counsel orally requested the court to order the bureau to make an analysis of the pill, indicating he had previously understood through a Topeka police officer such an analysis would be made. The principal reason advanced for the request was to save the state the burden of expense of private laboratory analysis. The prosecution opposed the request. The court took the matter under advisement until the following day when it heard the matter further. Additionally counsel indicated a time factor in getting the pill analyzed privately. The court denied the request. In making its ruling the court remarked:

"THE COURT: All right. The County Attorney is completely in charge of the prosecution of this case for the state. And no policeman has any authority

to make any commitment he will do anything for you in preparation of your defense. Regardless of what some policeman may have intended to do, the County Attorney obviously has no intention of making an analysis of some pills. And I am satisfied that he is not required to. I am satisfied that if you think the pills have any relevancy to the lawsuit and want them analyzed for use by you in the defense of this case that you are going to have to do it yourself.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: There is no valid agreement to have the pills analyzed and they're not about to have the pills analyzed. You can't make an agreement with a policeman even if he is an official in the police department that he is going to do something to help you prepare the defendant's case for trial. The County Attorney is the one in charge of this case and I don't believe the County Attorney has made any commitment to you, there is no evidence that he has. That will be my ruling. If you want them analyzed you will have to analyze them yourself. That's my best judgment.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: I mean [you] have to have them analyzed yourself."

Assuming relevance of an analysis of the pill (which appellee does not concede upon the showing made) we see no reason to declare it was essential that such analysis be made by a state law enforcement agency rather than by private individuals or agencies. The record affirmatively reveals that counsel for appellant was aware he might have the pill analyzed at public expense if he desired to do so. It also reveals this is not an instance of suppression of evidence by the prosecution. Counsel was never denied inspection or custody of the pill nor did anyone allied with the prosecution do anything to prevent him from having his own analysis of the pill made. The record further reveals counsel had other pills of the same kind which he had previously secured at appellant's home; we cannot tell whether or not these were ever analyzed.

At most the matter lay in the sound judicial discretion of the trial court and we see no abuse thereof in the ruling made.

On March 11, 1965, the state filed a motion to endorse the name of an additional witness on the information pursuant to K. S. A. 62-802. The same day counsel for appellant was orally notified of the requested endorsement and was given the name and address of the witness and a summary of her expected testimony. Hearing was had on the motion March 12 and, over objection, the request was allowed. The witness was a clerk in a liquor store in Wamego whose trial testimony was very incriminating to appellant.

As stated, trial commenced March 15. It appears the investigating police officers took a statement from the witness as early

as some time in November; the county attorney knew of her existence but first interviewed her March 11.

Appellant assigns the ruling permitting the endorsement as error.

K. S. A. 62-802 provides in pertinent part the prosecuting attorney shall endorse on informations filed by him the names of witnesses known to him at the time of filing and, in addition, names of other witnesses who afterward become known to him, at such times before trial as the court may prescribe. The statute is designed to protect a defendant against being taken by surprise at the trial. In applying it this court has consistently held such endorsement, even during trial, rests within the sound judicial discretion of the trial court and that, where permitted, material prejudice to the right of the defendant must be clearly shown before it constitutes reversible error (see *State v. Poulos,* 196 Kan. 287, 411 P. 2d 689, cert. den. 385 U. S. 827, 17 L. ed. 2d 64, 87 S. Ct. 63).

We think no such abuse of discretion is shown. Counsel for appellant was notified four days in advance of trial as to the witness and the expected testimony. The record discloses counsel did interview this witness prior to the commencement of trial; it is not shown how, by reason of the late endorsement, there was any disadvantage to appellant or how there would have been greater safeguard for his rights by reason of an earlier endorsement. In arriving at the conclusion reached we do not overlook counsel's request for continuance, to be discussed next.

At the conclusion of the foregoing hearing on March 12, the following occurred:

"Mr. Elwaine Pomeroy: We would respectfully move the Court for at least a one week's continuance in the trial of this case so as to allow us to adequately prepare for the defense."

The court denied the motion, which ruling is assigned as error.

K. S. A. 62-1414 provides that continuances may be granted in criminal cases for like causes and under like circumstances as in civil cases. Continuances in civil cases are governed by K. S. A. 60-240 (*b*) which provides:

"The court may for good cause shown continue an action at any stage of the proceedings upon such terms as may be just. . . ."

And K. S. A. 60-240 (*c*) provides the granting of continuances in all cases shall be discretionary. This latter proviso is in harmony with long-standing case law.

In *State v. Hickok & Smith,* 188 Kan. 473, 363 P. 2d 541, appeal dismissed 373 U. S. 544, 10 L. ed. 2d 688, 83 S. Ct. 1545, this court stated:

". . . the matter of a continuance in a criminal prosecution is largely within the discretion of the trial court and . . . its ruling thereon will not be disturbed unless it has been made to appear that such discretion has been abused to the prejudice of substantial rights of a defendant." (p. 482.)

(See, also, *State v. Latham & York,* 190 Kan. 411, 375 P. 2d 788, cert. den. 373 U. S. 919, 10 L. ed. 2d 418, 83 S. Ct. 1310.)

We think appellant's assertion of error is not well taken. Appellant's counsel, after his appointment February 2, 1965, assisted by his brother who is a practicing attorney in partnership with him, spent a total of approximately 330 hours in preparation for trial, including investigation, research and interview of all witnesses who testified at the trial. The record of trial reflects this massive preparation. It reveals industrious, zealous, competent and resourceful advocacy in behalf of appellant. Moreover, at the time the motion for continuance was made, no particular reason therefor was advanced, that is, good cause was not shown, and later, upon hearing of the motion for new trial, no showing was made, as it might have been, as to how or in what manner appellant was prejudiced by the denial of the continuance. Again appellant simply speculates that with more time something more favorable to him might have been procured; this is not good cause. Under all the circumstances no abuse of discretion is shown.

Appellant next contends he was denied due process of law in that the state legislature which at its 1955 session added the death penalty to our kidnaping statute (Laws, 1955, Chap. 193, § 1) was improperly apportioned and hence its acts were not valid.

This contention has been answered adversely to appellant in *State v. Latham &York,* supra, wherein it is said:

"Assuming that the legislature has failed to effect a new apportionment of the districts of its members as required by Art. 10, Sec. 2, nonetheless the acts of such legislative body would be those of a *de jure* legislature and the members thereof are *de jure* officers. All the reported decisions sustain the proposition that the fact a legislature has not reapportioned in accordance with the state constitution does not preclude it from making any law or doing any act within the legislative competence. (p. 426.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The question of the failure of the legislature to reapportion itself in accordance with the mandate of Art. 10, Sec. 2, could have no possible bearing upon the validity of the defendants' convictions." (p. 427.)

The remaining specifications of error involve trial rulings, requiring review of the evidence which is summarized as follows:

## PROSECUTION EVIDENCE

Betty Michael, who lived at 915 North Taylor in Topeka, the mother of Gladys Cora Johnson, aged seven, last saw Gladys alive at home about 7:30 Saturday morning, November 14, 1964, prior to leaving for work at a cleaning shop; Mrs. Michael had made arrangements for her three children to stay with a Mr. Eatmon at the Eatmon home at 1335 North Taylor until her return from work; the mother next saw Gladys' body a week later at a funeral home.

At about 8:00 a. m. a neighbor who lived across the street from the Eatmon home took her dog out in the yard; she noticed three Negro children inside the Eatmon yard—two girls and a boy; she went back inside her home and very quickly thereafter a little Negro boy and girl came to her front door crying and screaming; the boy, who was the six year old brother of Glady, said, "Lady, call the police. A white man took my sister and went that away." The boy said the man was in an orange car. The neighbor called the police.

On Saturday morning, November 14, an air force sergeant stationed at Forbes Air Force Base was going hunting north of Topeka; while traveling south on the Brickyard road northwest of Topeka looking for a place to hunt he noticed a car parked in a field about a thousand feet west of the road; he drove over along the side of the car which was a 1954 Plymouth, color light over dark brown; a white man and a small Negro girl were in the car; he had a brief conversation with the man about hunting; the man stated the property belonged to the Browns and that he had permission to hunt; the sergeant noticed the little girl was crying and whimpering; he spoke to her but she did not respond; the Plymouth automobile bore a Wyandotte county license tag which number the sergeant wrote down; he went to a nearby house where he was told the property did not belong to Browns; he returned to the field but no one was there; he went back to the house and at about 9:00 a. m. telephoned the sheriff's department about the incident; later he identified photographs of appellant's automobile as showing the same vehicle he saw in the field; on November 15 he identified photographs of Gladys Johnson as being pictures of the girl he saw in the car, and, out of a group of sixteen, he identified two photographs of appellant Zimmer as being the man he

saw in the field; on November 16 he identified appellant from police lineups as the person he saw in the field and at the trial he identified appellant as the same man.

The license tag number jotted down by the sergeant was identified as being registered in the name of William F. Zimmer, 1872 North Thirty-first Street, Kansas City, Kansas, for a 1954 Plymouth sedan.

Sometime between 12:00 noon and 12:30 p. m. on November 14 a clerk at a liquor store in Wamego, Kansas, noticed a car with a white top and a dirty pink or salmon body parked at the curb in front of the store; a white man and a small Negro girl were in it; the girl was staring straight ahead and did not move; the man went into a cafe next door and returned carrying a brown paper bag; as the car drove away the clerk noticed it bore a Wyandotte county tag; at about 1:15 p. m. the same car returned with only one person in it and parked in the store driveway; the driver came into the liquor store and conversed with the clerk about hunting; the clerk testified there were blood stains on his right arm and dry clotted blood around his fingernails; she noticed a ". . . very odd odor. It was something that I—I can't describe—something like a wild, not wild, but a freshly killed something I don't know."

The clerk identified photographs of appellant's car as similar to the car she saw; she identified appellant as the man she had seen with the Negro girl and who later came back to the liquor store.

On Sunday, November 15, the Topeka police department telephoned the police at Marysville, Kansas, that a kidnaping charge had been filed against appellant and requested his apprehension.

Appellant was arrested about 9:00 p. m. that evening in Marysville by local police and taken to the Marysville police station where an agent of the Federal Bureau of Investigation interviewed him; two bottles of whiskey were recovered from him; appellant appeared to have been drinking but was not drunk; at the time of the initial arrest the officers were looking for Gladys who had not yet been found; appellant's car was in Marysville; the FBI agent asked appellant, "Would you mind if we looked into your car?", to which appellant replied, "I don't mind at all. You can look at any thing I have"; appellant further stated, "You can search anything I have. I have nothing to hide"; appellant also replied to another police officer when asked about looking into his automobile: "Be my guest. Do what you want with it," that he "had no objection."

Two Marysville police officers, accompanied by appellant's

brother-in-law, took appellant's car keys, went to his car, unlocked it, and looked inside it and the trunk; the officers were told by the FBI agent to look for Gladys Johnson—that was their principal objective; the officers examined the trunk by flashlight and saw red stains on some newspapers, on a shallow box and on a white cloth covering a shotgun; they saw nothing else unusual and did not notice a hatchet; their only purpose in looking in the trunk was to see if there was a girl in it; nothing was removed from the car.

The FBI agent advised appellant of the kidnaping charge and, in the presence of his brother-in-law, advised him of his constitutional rights and "made sure that he understood them himself"; he advised appellant he did not have to make a statement, that any statement he made could be used against him and that he could consult an attorney or anyone else; the advice was repeated and appellant reiterated that he understod; appellant gave the agent a statement as to his whereabouts on Saturday, November 14.

Later, while still at Marysville, appellant gave a similar but more detailed statement to a Topeka police officer; he stated after getting off work on Friday, the 13th, he had purchased shotgun shells and whiskey in Kansas City; after arriving in Topeka he purchased more whiskey and visited various beer taverns, drinking beer and whiskey; later he did some drinking with a woman and man whom he did not know; the next thing he remembered was waking up alone Saturday morning a block south of the North Topeka fire station; he took a drink and drove west, stopping at Silver Lake around 7:00 or 7:15 a. m. to telephone his brother-in-law at Marysville to go on hunting as he would not be able to get there; then he went to Manhattan, stopped on the west side of Tuttle Creek lake, then went on toward Concordia, hunting pheasants on the country roads near there; he shot two and put them in the car; later he threw them away near Clifton; he went to Hanover, then called a lady friend at Marysville, picked her up and then went to a motel at Washington where he spent the night; the next day, Sunday, he and his lady friend spent the day on the sideroads hunting pheasants but did not see any; after taking her home he went to find his brother-in-law who informed him the police were looking for him.

Early Monday morning appellant was taken by Topeka police to the Topeka jail; before he left Marysville he telephoned his brother-in-law and requested that he call appellant's wife and tell her he was going to Topeka and to get him a lawyer.

Late Sunday night or early Monday morning appellant's car, which had been locked up, was towed to Topeka where it remained in continuous police custody.

On Monday, November 16, an attorney from Kansas City, Kansas, consulted privately with appellant at the Topeka City jail.

On the same day a search warrant for appellant's automobile was obtained and a copy served on appellant; the car, which had been kept locked, was thoroughly searched by the laboratory supervisor of the Kansas Bureau of Investigation and the contents removed and invoiced; when the trunk lid was opened the handle of a hatchet was visible but the entire hatchet was not, it being behind the spare tire; there was a reddish substance on the hatchet; visual observation disclosed the presence of hair on the hatchet; because of several stated reasons no attempt was made to take fingerprints from the hatchet; among items removed from the automobile were the hatchet, a piece of newspaper, a cardboard box, a pair of undershorts and a pair of trousers containing a white handkerchief which was not touched so that any evidence would not be disturbed, a pair of dress shoes and sweepings from the right front floor of the automobile; the custody and transportation of these items were traced to FBI laboratory examiners at Washington, D. C.

On Tuesday, November 17, after appellant had been visited by a lawyer and his wife, he was further questioned by police, one of whom testified:

"So at this time the Defendant says, 'Well, I do remember being in the pasture north of town with a little colored girl and she was crying.' And Major McKinney told him go ahead. At this time he asked him if he remembered anyone coming around the automobile anything other than him and the little colored girl being in the area north of town. He said, 'No, he didn't remember anybody else. The next thing he remembers,' he says, 'He went west and possibly a little north on gravel roads. He arrived at a school house. He doesn't know how far distance it was from the initial point where he said he had the little girl with him.' Said, 'This school house would either be a red or a buff, some color like that. It was not a white. Anyway it was an off shade he described it.' He said, 'It was on a graveled road on an upland grade sort of and in describing this school house,' he said, 'The inner door has a lock on it.' He said, 'By the inner door he meant it was an alcove or foyer, whatever you want to call it where the students go hang their coats up on the outside. There was hooks there.' He says, 'He remembers getting out of the car and walking into this foyer. The little girl is still in the car right at this time. He was scared and hunting a place to hide.' This is what he said at this time. 'He comes back out,' he said, 'And gets in his car and goes west and possibly north again. He doesn't know how far. And he

comes to a field. He describes this field as being a field where you turn in off of a graveled road,' and he said, 'As you turn in,' he said, 'There's a dry wash in the right-hand side. This dry wash is bordered with trees.' He said, 'It's a winding dry wash.' He said, 'And I drove clear to the end of it where you couldn't be seen from the road.' He said, 'There was a small terrace right next to this dry wash,' and at this time he was asked if there was a machine made or a natural terrace like they do make in fields. He said, 'He thought it was man made, but he wasn't certain. He described this field.' He said, 'This field was sloped a little bit and it was either alfalfa or wheat in this field other than the tree lined dry wash.' He said, 'He next remembers that he looked over at the little girl and she was still sitting here in the front seat. He takes a drink of whiskey, leaned back in the seat and this is the last he remembers until he wakes up.' He says, 'He don't know how long it is. He don't know what time he got there, but then he wakes up and on wakening,' he said, 'It's getting dusk. That the sun. is in his eyes and the little girl is not in the front seat, but he looks back and the trunk lid is up. He gets out of the car and walks to the trunk lid and the little girl is laying inside the trunk.' He said, 'By looking at her, the wounds and the blood about the head and her body was cold,' he said, 'It was getting cold. That he knew that she was dead.' He said, 'He picked her up. She had on a pink dress.' He said, 'He picked her up and took her to the terrace that he was parked beside on the dry wash there and laid her on the back side of the terrace on this dry wash that bordered this dry wash.' He was asked at this time, Major Mc-Kinney asked him at this time if he had sexually molested the little girl, and he said, 'I don't know.' He said, 'But the tests will show when they find her.' He was asked if she had any clothing on and he said specifically at this time, 'That she had the pink dress, but he could not tell, he could not remember whether she had any underclothing on or not.' He was asked again if he had molested her at any time. He said, 'He did remember slapping her, in the area north of town because she was crying.' Also at this time he was asked again about the hatchet. He said, 'That the hatchet that he was shown the day before did look like his hatchet. He had one like it in other words.' He said, 'But he don't know how it got in the car. He thought it was home in his garage.' He says—oh, at this time also he said, I believe he said, 'That his lawyer was going to be mad at him for talking to us.' But he said, 'Then he left the field and he drove some more. . . .'"

The officer further testified appellant stated he went to Wamego, then toward Marysville stopping occasionally to remove bloody papers from the car trunk and hide them in culverts and grass; that around 9:00 p. m. he arrived at his brother-in-law's house at Marysville; his brother-in-law informed him the police were looking for him—he told him "Okay, he would head back for Kansas City," but he went west; near Hanover Junction he threw away the rubber mat from the trunk of his car and fired his shotgun twice to substantiate his story about shooting pheasants; then he went to Hanover to call his Marysville lady friend with whom he had a

few drinks and later spent the night at a Washington motel; the next day he spent hunting the sideroads for pheasants; he took the lady home that evening and was later arrested at Marysville; appellant stated he wanted to go and help find the little girl's body.

The following day, Wednesday, November 18, appellant went on the search for the girl's body but he appeared to have trouble finding the field although he described it in detail; on Saturday, November 21, a hunting party found the dead body of Gladys lying on a creek bank in a rural area about four miles northwest of St. Marys, Kansas.

The Shawnee county coroner, a physician and surgeon specializing in pathology, examined the body at the scene where it was found; the body was clad only in a pink dress and was frozen; there was only a small amount of clotted blood under her head; based upon his examination of the body and the ground under it he was of opinion she was not killed there but was dead not more than thirty or forty minutes when placed there; the doctor performed an autopsy; there were two large crushing blows on the head, which shattered the skull; there were four deep wounds with ragged edges across the neck and shoulder, one of which fractured the spinal vertebrae and spinal cord; death was caused by the blows to the head and spinal vertebrae, any of which could have been fatal; the head wounds could have been caused by a blunt instrument such as a rock, tire iron or hatchet; the neck and shoulder wounds could have been made with the cutting edge of a hatchet such as the one found in the trunk of the appellant's car; the wounds were made by a chopping type blow; there was no evidence of trauma to the vagina and evidence of sperm could not be isolated in the vagina, rectum or mouth.

Additionally, there were sent to the FBI laboratory the following: A small sample of Gladys' blood, hairs from her head, her pink dress, and a pair of white coveralls worn by appellant while he tried to cut his wrist at the Topeka jail.

A chemist at the FBI laboratory whose work consisted of examination of body fluids including blood, testified as a result of his examination of the various exhibits heretofore mentioned that the stains on the cardboard box and the piece of newspaper were blood stains of human origin; that corresponding spots on the trousers and the undershorts were blood of human origin; he was unable to determine the blood grouping of the foregoing; that the

trousers, undershorts and pink dress were negative for evidence of semen; he identified stains on the handle and blade of the hatchet as being blood stains of human origin, the blood belonging to group O; there were possible blood stains on both dress shoes but this was not definite, nor was it possible to determine origin; the sample of Glady's blood was identified as belonging to blood group O; a quantity of blood on the coveralls could not be typed definitely as to grouping because of the fabric of the coveralls.

A hair and fiber examiner at the same laboratory testified as to his examination; he explained in considerable detail that hairs of three races, Caucasian, Negroid and Mongoloid, can be separately identified and within each race hairs may be further examined microscopically with magnification up to 900 times so that approximately twenty-one separate characteristics or points of identification may be made for the purpose of hair comparison; he described hair composition and the method of analysis; the sweepings from the front floor of the automobile contained both Caucasian and Negroid hair; there were three short Negroid hairs adhering to the reddish substance on the matchet; the handkerchief in the trousers' pocket contained two fragments of Negroid hair possibly 1/16th to 1/32d inches long; all of these hairs as well as the known samples of hair from Gladys' head were analyzed and all possessed the same twenty-one characteristics or points of identification; the witness was of opinion there was only a remote possibility that the hairs in the sweepings, the handkerchief and on the hatchet came from any person other than Gladys Johnson.

## Defense Evidence

Appellant testified in his own behalf. He described his family and work background; he stated he did drink and since he had quit smoking he had had a weight control problem; to control his weight he obtained some pills from a fellow employee which he had been taking one in the morning and one in the afternoon off and on for a period of three or four years; in August of 1963, in Kansas City, while enroute to the postoffice in his automobile he was cursed by some children who were blocking the street, with the result he argued with a child's mother and several days later was arrested on a child molestation charge; this charge was later dismissed; his only other arrests were for peace disturbance and running a stop sign; in January, 1964, he was arrested

but the only thing he remembered was getting up from the supper table and waking up next morning in jail.

On Friday, November 13, 1964, appellant got off work at 3:30 p. m. and after doing some chores and buying some ammunition and a half pint of whiskey he started for Marysville where he had arranged to go hunting; around 8:30 p. m. he stopped at Topeka to get more whiskey and then went to three beer taverns where he spent the evening; he met a woman from Phillipsburg and then a man with whom he drank; before midnight he went to the bus terminal but was hazy about what happened thereafter; he thought he went back to the taverns but was not clear; he had a hazy remembrance of going to a colored barbecue tavern in North Topeka; the next thing he remembered was waking up in his car Saturday morning south of the fire station; there was another fellow lying in the back seat; he had not seen this man before; each of them had a bottle; the man indicated appellant had promised to take him to Manhattan; appellant took a drink and started out; at Silver Lake he took another drink and he telephoned his brother-in-law to go on hunting; the other fellow started driving and appellant got in the back seat of the car; he further testified:

"Q. What do you next remember?

"A. Next thing I remember is urinating by the side of the car, and I looked around, and the rear door was open, and the trunk lid was open about that much. And this pasture was not the pasture that the Airman seen me in, but a pasture that had a pond in it, and this pond was, oh, an eighth of a mile away from the car, but beyond this pond was a house that you could see from where the car was parked. Now that's the pasture that I was in. And in the trunk was this poor little girl with her feet sticking out of the trunk about a foot.

"Q. What did you do?

"A. Well, I pushed them in the trunk and closed the lid then got in the car and drove off. This is in the pasture. I had to let myself out through a gate to get out of it, and I stopped and opened the gate, drove out and closed the gate because there was stock in the pasture.

"Q. And then what did you do?

"A. I drove around. I don't know just what direction I was driving in, thinking what happened to me, and I was—what am I going to do with this body, and I stopped at this school house, in the school. And the school house we found later was white, but I thought it was colored. It was tan colored school house. I got out and walked around the car and into the school house foyer, and it was locked. I got back in the car and drove off and went some distance. I don't know how far, but I guess it isn't too far from this school house to this field that had alfalfa or wheat in it and drove back in there, and again I'm not clear on my directions because the detectives told me I was

wrong. I drew them a map of this place. They said, 'My directions was off.' After I got to the end of this field I took another drink and I—I must have passed out because I went to sleep. I don't remember anymore until almost dark when I woke up again. That's when I got out of the car, lifted up the trunk and laid the little girl along the bank—(did not finish sentence).

"Q. What did you do then?

"A. I seen a lot of blood in the trunk on some newspapers. These newspapers I took with me to use to clean the game with they are always short of newspapers in Marysville. I don't think they take any regular newspapers. We take the Kansas City paper and had plenty of them, so I always bring some along. Well, the blood was all over these papers, so I thinking I got to get rid of those papers some way so I closed the lid, got back in the car and drove off. Now this is getting dark. It's getting sundown.

"THE COURT: Still Saturday?

"THE WITNESS: Still Saturday, Sir. And the next city I remember coming into is the east edge of Wamego. So we had a difficult time finding out where this was because I didn't remember going through any other towns."

Appellant testified he did not remember being in the field where the airman saw him; the first time he saw the little colored girl she was in the trunk dead; he had no memory of seeing her alive; he had no explanation why he did not then seek help; after leaving Wamego he started scattering papers along the drainage and weeds until he got rid of them; he finally arrived at Marysville about 9:00 or 9:30 Saturday evening where his brother-in-law told him the police were looking for him; he told his brother-in-law he would go back to Kansas City; he didn't know why the police were looking for him; he looked in the trunk with his flashlight to see if there was more blood; he saw blood on the mat so he threw the mat away; he further testified: "And I thought well they are going to want an alibi and I don't have no alibi, so I will just tell them I went hunting. So I discharged my shotgun couple times as evidence that I'd gone hunting." He then drove to Hanover, called his lady friend, bought two pints of whiskey, returned to Marysville and then went to a Washington motel where he spent the night with his friend; the next day he drove around country roads with her looking for pheasants; he did not tell her about finding the body; after eating supper he returned to Marysville about 7:30 or 8:00 Sunday evening; he got two half pints of whiskey and had just found his brother-in-law when the police arrived; he admitted the story he first related about the affair to the police on Sunday night was similar to that which the Topeka police officer testified to, and that his statement Tuesday evening, November 17, was the same as related on the witness stand by police officers; he told that story so they would

not bother him any more; the officers were courteous and did not threaten him, "They took the opposite approach, the buttering-up type approach"; he didn't tell about the girl when first questioned because he "was trying to search my mind for more of the information that was lacking," ". . . I wanted time to think"; he hid the bloody newspapers to "get rid of the evidence"; later on Tuesday night, November 17, he tore the brass top of a lead pencil apart to make a jagged instrument and tried to sever an artery in his arm; he lost some blood and fainted twice; he had done this after one of the police officers told him his fingerprints were found on the bloody hatchet and related other incriminating evidence, and that they "had it on him" and he was never going to get out; the next day he drew a picture of the field and he want with the officers to look for the body; he kept his weight control pills in the basement of his home in Kansas City; no one knew where they were; when he left Kansas City his pill bottle, which holds ten or fifteen, was more than half full.

At the time of the search of the automobile at Topeka an officer removed a pill bottle containing a pill from appellant's suitcase.

Appellant's brother-in-law, who lived at Marysville, testified appellant called him Thursday, November 12, about pheasant hunting and again on Saturday morning, November 14, saying something about having a flat tire and for him to go on hunting; appellant was supposed to be there by noon but he next saw him Saturday night about 8:30; appellant had beer breath but appeared sober; he asked appellant what he had done and appellant said nothing; he told appellant the police were looking for him; appellant said he would go to Kansas City to find out about it; he next saw appellant Sunday night, intoxicated, and again told him the police were looking for him; he denied knowing anything about the missing Negro girl; then the police came up; at the police station the FBI agent advised appellant of his rights and that he could call a lawyer if he wanted to; the brother-in-law testified as to an incident in July, 1964, when appellant was very intoxicated at Marysville just prior to a scheduled train run; he and his wife attempted to sober appellant up with black coffee; he made the run but later told them he had run the train from Marysville to Topeka before he knew anything that was happening; after being informed appellant had tried to take his life, he visited him at the jail; appellant seemed remorseful and said he must have done it

because they had found his hatchet and that he didn't want to live if he had done this thing; the little girl had not been found at this time; the witness knew of no weight control efforts on appellant's part other than the food he ate.

A Topeka tavern owner testified appellant was in her tavern the night of Friday, November 13, from about 9:30 to 11:45; he had danced and tried to "pick up" a waitress there; after he had picked up a waitress's purse, the witness refused to sell him any more beer but gave him a six-pack to go; appellant was seen talking to a man called "Sherpy" while at the tavern.

A laborer at the state printing plant was walking home from his work between 2:00 and 2:30 a. m. the morning of November 14; he saw appellant and another man in a car about two or three blocks west of North Topeka Avenue; appellant, who was drinking from a bottle, offered him a drink and asked him if he knew where he could find a "colored doll"; appellant displayed identification papers showing he was not a policeman; this was an area near the home of Gladys Johnson.

A Topeka police officer received a call about the missing girl at 8:06 a. m., November 14; he went to the neighbor's residence from where the call had come; across the street there were two small children crying, Donette and Elmer Johnson; the children told about a man in an orange and white car grabbing their sister Gladys; one said it was a colored man; the officer then telephoned the mother at the cleaning shop; soon thereafter a police search began.

Two neighbors of appellant testified he had been a good neighbor, that he had a good reputation and they had known of no trouble; a fellow employee and former brother-in-law stated appellant had a good work record and a good reputation among his fellow employees.

A psychiatrist at the Menninger Foundation, who in January had been a member of the sanity commission for appellant, examined him in March, 1965, and testified as to the result; a complete psychiatric and psychological evaluation was made; there was no organic or neurological problem; no evidence of definite disease was found; there was no significant mental disorder and no diagnosis was made; the examination indicated a fairly stable, emotionally controlled, average individual; appellant gave a history of blackouts, all except one being associated with drinking; excessive

drinking, among other things, will produce amnesia; a retrograde type amnesia could have blotted out the memory of a heinous act; drunkenness can cause loss of perception and impair judgment to handle unusual situations, depending on degree; appellant was not insane, he understood the difference between right and wrong and knew certain acts were prohibited.

A psychologist at Menninger's administered a battery of psychological tests to appellant. The tests did not reveal the presence of any tendency toward sexual perversion or much seriously wrong in terms of personality integration.

By way of rebuttal evidence for the prosecution the police officer in question denied he had told appellant his fingerprints were found on the hitchet and that he was "never going to get out."

Appellant urges as ground for reversal of his conviction that proper venue as to the murder offense was never established in Shawnee county, inasmuch as there was no evidence the killing occurred therein. He argues the state produced evidence the victim was last seen alive in Wamego in Pottawatomie county; therefore the murder offense could be prosecuted only in that county.

Section 10 of the bill of rights to our Kansas constitution provides in part:

"In all prosecutions, the accused shall be allowed to appear and defend in person or by counsel . . . and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed. . . ."

This is implemented by the following statutes:

"Offenses committed against the laws of this state shall be punished in the county in which the offense is committed, except as may be otherwise provided by law." (K. S. A. 62-401.)

"When a public offense has been committed, partly in one county and partly in another, or the act or effects constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." (K. S. A. 62-404.)

And our statute denouncing kidnaping provides:

". . . Any person or persons charged with such offense may be tried in any county into or through which the person so seized, inveigled, decoyed, kidnaped, or otherwise taken shall have been carried or brought. (K. S. A. 21-449.)

It is true as contended there was no evidence as to where the fatal blows were struck.

Appellant was charged in the information with felony murder,

that is, killing while engaged in the perpetration of a felony, namely, kidnaping. The jury was instructed upon this type of murder and appellant stands convicted thereof. Hence the kidnaping was an essential element of the murder offense. Inasmuch as the initial abduction occurred in Shawnee county and the kidnaping was triable there, venue on the murder charge became permissible there under 62-404.

It may be noteworthy that the general area in Pottawatomie county where the victim was last seen alive other than by her killer and where her body was found, is so situated it lies within five or six minutes driving distance from three adjoining counties, including Shawnee, and no more than fifteen minutes from at least two others. A murderer should not escape punishment because the exact place of his crime is concealed.

The Supreme Court of Washington was confronted with an identical factual situation where the same legal contention was made as here in *State v. Wilson*, 38 Wn. (2d) 593, 231 P. 2d 288, cert. den. 342 U. S. 855, 96 L. ed. 644, 72 S. Ct. 81, cert. den. 343 U. S. 950, 96 L. ed. 1352, 72 S. Ct. 1044. The defendants there were convicted of kidnaping in the first degree and murder in the first degree and the death penalty imposed. The facts were that the victim was kidnaped in Clark county, Washington, and a week later her body was found in Skamania county, Washington, fifty-five miles from the scene of the kidnaping. She had been brutally beaten, cut behind her ear and sexually violated. Death was caused by carbon monoxide poisoning. The evidence did not reveal where the cause of death occurred.

The state of Washington has a constitutional provision respecting place of trial essentially identical to that quoted from our own bill of rights and an implementing statute identical to our 62-404.

Under a statute similar to our own the defendants in *Wilson* were charged with felony murder. The court held the county wherein the kidnaping occurred had jurisdiction to try the murder charge, stating:

"Nor does the fact that no one can say with certainty whether the death occurred in Clark county, where the kidnaping occurred, or in Skamania county, where the body was found, present any bar to the prosecution for murder in Clark county." (p. 599.)

See, also, *People v. Abbott*, 47 Cal. 2d 362, 303 P. 2d 730.

We hold venue on the murder charge was properly established in Shawnee county.

At the conclusion of the prosecution evidence appellant moved for his discharge upon the venue issue already mentioned and upon the ground appellee had failed to prove the kidnaping charge. Denial of this motion is assigned as error. This contention is based upon the argument there was no evidence that the girl Gladys was confined against her will.

The child was taken under such circumstances as to cause crying and screaming in her younger brother and sister, she was crying when seen in appellant's company in the field northwest of Topeka and appellant admitted to officers he slapped her because she was crying. She was found brutally murdered. The contention is wholly without merit. Moreover, as a matter of law, a child of tender years may not consent to its seizure. At 1 Am. Jur., 2d, Abduction and Kidnapping, § 16, the rule is stated:

"A child of tender years is ordinarily regarded as incapable of consenting to its seizure and abduction and, when taken from its rightful guardian, is deemed to have been taken without its consent as a matter of law."

The jury here was later instructed in accordance with the foregoing and properly so. The evidence was sufficient to support the charges, including the element of wilfulness, and the court committed no error in denying the motion to discharge.

Appellant next complains that the hatchet and other items taken from his automobile were obtained as a result of an illegal search and seizure and were improperly received in evidence. He now argues he was not in his car when arrested in Marysville and the officers had no right to look into the car without a search warrant. At the time of the later minute search of the car when the articles were removed, a search warrant had been obtained. No objection was made at the trial to the reception of this evidence and in view of this, the contention might well be disposed of on the basis of the contemporaneous objection rule (K. S. A. 60-404). This rule does serve a valid purpose. However, we need not so bottom our decision. Nor need we dwell upon the proposition that a search which is a bona fide effort to save life, weighed in the scales of human values, is a justifiable invasion of privacy and does not constitute an unreasonable search so as to seal off anything within possible ambit of that effort. The record is replete with clear and convincing evidence of express, voluntary, intelligent consent by appellant to that initial search. The constitutional immunity from unreasonable searches may be waived by consent to the search.

In *Zap v. United States*, 328 U. S. 624, 90 L. ed. 1477, 66 S. Ct. 1277, the rule is stated:

". . . the law of searches and seizures as revealed in the decisions of this Court is the product of the interplay of the Fourth and Fifth Amendments. But those rights may be waived." (p. 628.)

See, also, *State v. Emory*, 193 Kan. 52, 391 P. 2d 1013.

Appellant complains that color slides or reproductions of the victim's body were, over his objection, improperly admitted into evidence. These were pictures taken prior to autopsy after the body had been removed to Topeka. Pictures in black and white film were taken of the body at the scene where it was found. These were received in evidence without objection. It is argued the use of the color slides was needless, inflammatory and done only to emphasize the gruesome nature of the crime.

The trial court carefully previewed these slides prior to their showing to the jury and in doing so rejected some that were offered. It limited the length of their showing by projector while the coroner was testifying. The slides were used by the coroner to demonstrate depth of the wounds and type of blow inflicting them. Later, after the jury had retired for its deliberations, the slides, along with other exhibits, were, with permission of the court, taken into the jury room.

We see nothing wrong in connection with the color slides. They tended to illustrate material facts in the case. That they were gruesome merely reflected reality—the shocking nature of the killing. No error is shown in their use (see *State v. Turner*, 193 Kan. 189, 392 P. 2d 863). Nor do we find abuse of judicial discretion, as contended, in permitting the coroner's demonstration of the hatchet during his testimony.

The trial court excluded two exhibits offered by appellant. One was a picture of a man called Sherpy, an itinerant seen in appellant's company at a tavern Friday night, November 13. Appellant argues the photograph should have been received to show any possible facial resemblance between Sherpy and the appellant on the premise it may have been Sherpy who was seen the next day with the girl. The difficulty with the argument is there was no foundation laid nor facts shown from which such an inference could be drawn. Appellant testified the man who was with him in the car Saturday morning was a man he had never seen before. There was nothing to connect Sherpy with the abduction on Saturday morning any more than countless other men whose pictures

could have been produced. It was not shown that the proffered exhibit had probative value nor is it shown here there was error in its exclusion.

The other exhibit excluded was a copy of a psychologist's report of examination of appellant. The psychologist was present in court and testified at length as a witness for appellant. Not only was he available to testify as to matters covered in the report, he in fact did so except so much thereof as amounted to sheer speculation as to whether appellant did in fact commit the crime. Statements of this nature would not have been admissible even if made by the psychologist while testifying as a witness. The ruling was correct.

Certain testimony proffered by appellant was excluded. A Topeka police officer was not permitted to testify as to the alleged request on behalf of appellant to have the pill already metioned analyzed. We have discussed the propriety of the request so far as pretrial court action thereon was concerned. Appellant had sought to use the request as a straw man at the trial; as evidence it was irrelevant and properly excluded.

The trial court sustained appellee's objections to three questions put to the psychiatrist. One inquired whether tests given appellant revealed any tendency toward sexual perversion. This information was, without objection, subsequently elicited from the psychologist who testified, in view of which error may not now be predicated upon the prior exclusion. The other two questions called for opinions of the psychiatrist touching upon the possibility of whether or not appellant had in fact done the killing. The witness himself conceded any answers he might give would be in the realm of sheer speculation. Their purely conjectural nature is further shown in his affidavit filed upon motion for new trial embodying testimony he would have given. Opinion evidence as to physical or mental condition based upon reasonable medical certainty or probability is permissible. Such expert testimony is admitted as being based upon generally recognized and established scientific principles. The opinions sought here admittedly were not of that character. The trial court did permit a wide range of inquiry into appellant's mental condition and the psychiatrist testified at length as to that. However, the testimony sought lacked scientific basis to support it beyond the realm of mere possibility and was so conjectural as to lack probative value. The court committed no error in sustaining the objections.

Appellant contends the court erred in failing to instruct the jury on the lesser offense of murder in the second degree as requested. The trial court considered this proposition in a well-reasoned memorandum made part of the trial record, ruling in effect appellant was either guilty of first degree murder as charged or not guilty of any degree of homicide. We approve the action taken.

Murder in the second degree is murder committed purposely and maliciously, but without deliberation and premeditation (K. S. A. 21-402). What is commonly referred to as felony murder is defined as any murder committed in the perpetration of any felony (K. S. A. 21-401). Appellant was charged with this type of murder, the felony being kidnaping in the first degree (K. S. A. 12-449), a crime involving violence, either actual or threatened. The defense was two-fold: That appellant did not commit the acts, or if he did, he lacked the requisite intent by reason of his state of unconsciousness from drinking.

In *State v. Kornstett*, 62 Kan. 221, 61 Pac. 805, the defendant was convicted of murder in the first degree. The information in effect charged felony murder. The defendant attempted to ravish the victim, then choked and beat her, struck her head against a tree and threw her in a well twenty feet deep. The wounds inflicted caused death. The trial court refused to instruct on any lesser degree of homicide. This court stated:

"The charge of the court should be applicable and limited to the facts in evidence, and where the testimony shows beyond question that the defendant was either guilty of murder in the first degree or innocent of any offense, it is unnecessarily to charge the jury as to any degree of the offense other than murder in the first degree." (Syl. ¶ 7.)

In *State v. Clough*, 70 Kan. 510, 79 Pac. 117, this court said:

". . . it is not error for the trial court to omit instructing the jury as to any one, or all, of such lower degrees of crime included in the charge, when the evidence tends to establish the highest degree of crime charged and does not tend to establish guilt of any lower degree of crime included therein." (Syl. ¶ 1.)

In *State v. Roselli*, 109 Kan. 33, 198 Pac. 195, the defendant and a companion held up a store. While the robbery was in progress, the companion killed the storekeeper. Defendant was charged with murder in the first degree. The defense was an alibi. The court refused defendant's request to instruct on second degree murder. Defendant's first degree murder conviction was affirmed. This court stated that killing in perpetrating certain felonies of

violence is the statutory equivalent for the deliberation and premeditation essential to murder in the first degree, and further, that, if defendant was present when the crime was committed, he was engaged in a robbery and the elements of deliberation and premeditation, which must be utterly absent in second degree murder, were incontestably present.

In the case at bar neither side produced evidence from which it can be said or inferred that appellant did the killing purposely and maliciously but without deliberation and premeditation. If it could be conceded there were any such evidence, appellant still would not be entitled to the instruction sought. Kidnaping, which involves the detention of another, is a continuing offense. The kidnaping could not be deemed to have been terminated or abandoned at the time of the killing so as to reduce the gravity of the homicide. The conclusion is inescapable the killing was committed during the perpetration of the kidnaping. Appellant was either present in the course of the kidnaping when the killing occurred (and mentally responsible) and guilty of first degree murder, or he was not present and, therefore, not guilty of any degree of homicide. To have given the instruction on the lesser offense would have permitted the jury to speculate on a degree of homicide not in the case upon any theory.

Appellant's complaint as to the initial failure of the transcript to reflect that in reading the instructions to the jury the trial court stated all possible verdicts which might be rendered has now been satisfied by a correction to the transcript by the official court reporter. It appears the jury was correctly informed by the court, both orally and in written instructions submitted to it, as to all possible verdicts in the case including verdicts of not guilty, and not guilty by reason of insanity, as to both charges.

Appellant urges that the sentences imposed by the jury are inconsistent, repugnant and impossible to carry out. The specious argument that execution of the capital sentence destroys the effect of the sentence to life imprisonment warrants little comment. The jury was instructed to consider the offenses separately, which it manifestly did. Each sentence was legal and within the jury's competence to impose and each may be lawfully executed as adjudged.

Appellant urges error in the overruling of his motion for new trial. As grounds, in addition to that which has already been dis-

cussed, he asserts insufficiency of evidence to support the findings of guilty. We need not labor the matter. Forty-eight witnesses testified and over fifty exhibits were received in evidence. The seven year old victim was abducted. Soon thereafter, appellant was seen alone with her in a field near Topeka and later in the city of Wamego. Identification was positive. The girl was hit and chopped to death with a weapon found in appellant's automobile. There were other incriminating circumstances, including appellant's admissions and his sworn statements at trial, so that evidence of guilt was overwhelming. The issue of his criminal awareness was, under appropriate instructions, submitted to the jury and resolved against him.

Appellant's rights were scrupulously respected throughout. The police in the performance of their duty accorded appellant all the safeguards of the law. At trial, counsel vigorously and ably prosecuted and just as vigorously and ably defended. Each maintained a high level of advocacy for his cause. The trial judge, in what was a long and difficult hearing, acted with the utmost deliberation and care to the end that a fair trial be had for all. We think a fair trial was had and the result must be upheld.

Appellant has attached an appendix to his brief which purports to be an unofficial transcript of a postconviction proceeding held June 13, 1966, at Liberal, Kansas, in case No. 8840 in the district court of Seward county, Kansas, entitled Charles Kemp, petitioner v. State of Kansas, respondent.

It appears that in the Seward county district court one Charles Kemp had previously pleaded guilty to the offense of rape upon Gladys Cora Johnson. The alleged rape had occurred near Liberal, Kansas, on March 23, 1962, at which time Gladys was about four and one-half years old. The rape charge was preferred by Gladys' mother, who then lived at Liberal and was known as Betty Williams.

After it became known appellant had been convicted in Shawnee county of an offense involving the same girl, Mr. Kemp filed his application to vacate his conviction in the Seward county court pursuant to K. S. A. 60-1507. At the hearing Mr. Kemp testified he was "framed up" on the charge by Gladys' mother, going into considerable detail as to the circumstances. It also appears the mother, Betty, had, while at Liberal, charged another man with molesting Gladys but there was no prosecution.

Although there may be question whether this record is properly

before us for any purpose, nevertheless, since this is a capital case, we have examined it.

We need not detail the contents of that record. Suffice it to say it reveals no connection in any way between the two offenses. If the record of the Kemp proceeding could be said to cast doubt upon the credibility of Betty as a witness or upon her character as a good mother to Gladys, then the answer would be that the conviction of appellant does not rest in any way upon either. Appellant seems to argue that if he had had more time to prepare his defense, or that if he had had an attorney appointed promptly upon his request, he might have known about the Liberal case prior to trial. Here again, the answer would have to be the same—no connection except coincidence of the victim.

One further matter, not affecting guilt or innocence, remains: The amount of compensation for appellant's court-appointed counsel. K. S. A. 62-1304 provides such counsel "shall receive a reasonable fee for his services, which shall be set by the trial judge and the same shall be paid from the general fund of the county in which the action was tried."

Counsel made application for payment of his services in accordance with this statute, documenting it with a record of the time spent in preparation and trial, and of expense incurred. Evidently the matter was considered by the four district judges of Shawnee county *en banc* and a fee of $2,500.00 with expenses of $1,087.55 was allowed. We are asked to increase this amount.

The amount of compensation of court-appointed counsel, under the statute, rests within the sound discretion of the trial judge. Before we can disturb the amount fixed we must first find abuse of that discretion. Without in any way minimizing the quality and fidelity of the service rendered, we cannot make such finding here. We are mindful that even when substantial fees are allowed to court-appointed counsel, there may be instances of some sacrifice, but fortunately, any sacrifice now is not as great as before when members of the bar were called upon, as a part of their professional obligation, to serve without compensation or for a token amount. In the case at bar a substantial amount was allowed; we simply hold it was not so disproportionate to the service as to constitute abuse of sound judicial discretion.

The judgment and sentences are affirmed.

APPROVED BY THE COURT.