No. 45,034

STATE OF KANSAS, *Appellee*, v. JAMES LOUIS JOHNSON, *Appellant*.

(439 P. 2d 86)

Opinion filed April 6, 1968.

*Robert M. Brown*, of Topeka, argued the cause and was on the brief for the appellant.

*Robert D. Hecht*, county attorney, argued the cause, and *Robert C. Londerholm*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: Appellant James Louis Johnson was tried before a jury for first degree murder in the slaying of his wife. He was convicted of the offense of murder in the second degree, his motion for new trial was overruled, he was sentenced to a term of twenty years imprisonment, and has appealed.

Appellant, twenty-five years of age, and a life-long resident of Topeka, first met his wife, Carlease, aged twenty-two, in April of 1964 and commenced living with her about three weeks later, believing she was single. She became pregnant and delivered appellant's child on April 14, 1965. Upon learning Carlease was married appellant left her until after she was divorced in January, 1966, but subsequently married her. Appellant and Carlease appear to have had a discordant and stormy relationship prior to and during their marriage, the difficulty being, according to appellant, her conduct with other men.

In the middle of August, 1966, they went to a lawyer for divorce papers, filed by appellant. Around the end of August, 1966, Carlease went to her mother's home in Texas, leaving their child with appellant. While away she wrote and telephoned appellant, indicating she wanted reconciliation with him. Shortly after

Thanksgiving appellant drove to Texas to bring his wife back to Topeka. After a short stay in Texas they drove back to Topeka, drinking tequila on the way, arriving in Topeka the evening of November 25, 1966. Appellant picked up their child where it had been left, made a purchase at a store and went home. He drank more tequila after arriving in Topeka.

With this background we turn to the further sequence of events disclosed at trial.

Appellant came to the home of a next door neighbor the evening of November 25, 1966, and asked her to call the police, saying he had shot his wife. He took his baby to his aunt's home, crying, and saying Carlease was dead or that he had shot her. He told the aunt he didn't mean to do it, that he wanted to scare her; he had shot in the floor and turned the chamber and then pulled the trigger and he was surprised because he anticipated hearing a snap and the gun went off.

Topeka police officers arrived at appellant's home about 7:30 p. m. November 25th and found Carlease's body. Appellant identified himself and handed them a revolver. The cylinder of the revolver was chambered for six cartridges; one chamber was empty, three contained live rounds of ammunition and two contained spent cartridges. The officers arrested appellant and took him to the police station. En route they told him he had a constitutional right not to make any statement, that any statement he made could be used against him in a court of law, that he had a right to an attorney and if he could not afford one, one would be appointed for him. These officers asked appellant no questions. Appellant asked, "What does a man usually get for what I've done?" One officer replied, "I don't know what you're talking about," and appellant said: "How much time does a man get for shooting his wife?"

At the police station at about 9:00 p. m. appellant was questioned by police detectives who first advised him of his constitutional rights as to self-incrimination. Their testimony, received after a hearing on admissibility outside the presence of the jury, revealed that although there was an odor of alcohol, appellant was not considered to be under the influence of alcohol; that appellant stated his wife had been "messing around with other guys"; that she had been going with a younger man, that an argument developed over her association with other men and he told her, "don't ever mess on me again", "don't hurt me no more"; that he had the revolver with

five cartridges in it; she tried to grab him and he hit her, knocking her down; he first fired a shot in the floor; she was on the floor when he fired the second shot; he knelt down, placed the gun close to her head and pulled the trigger, thinking it would hit on an empty chamber and expecting to hear a click; the gun went off; he loved her and didn't intend to do it; he only intended to scare her; he had threatened her but didn't intend to kill her; he had caught her with a man in January and had shot the man.

A bullet was removed from Carlease's brain, the point of entry being in the left temple area where there was concussion causing a splitting of the skin and powder burns, indicating close range firing.

A sister of an eighteen year old boy with whom Carlease had been associating, and also Carlease's parents, testified as to prior conversations with appellant about Carlease; that appellant had stated he loved her and wanted her back; that before he would see her with anyone else he would see her dead; that if it was the last thing he did, he was going to kill her; if he found her he was going to kill her; he had told the sister he loved his wife and wanted her back; that he had fooled around with a lot of girls but they didn't mean anything to him and he just wanted that one woman.

Appellant testified in his own behalf. He stated he and his wife had had much trouble, the main source of which was other men in her life; that after returning home on the evening in question he had discussed with his wife her running around; she said, "James, I know I was wrong, but I'm going to be a good wife to you. I'm going to make it up to you"; that he responded, "You tell me this every time we break up and go back together. Then you turn around and you keep on doing the same thing. I can't take no more of it"; he then fired a shot between her legs into the floor as she sat on the bed; he was trying to scare her and impress her he meant what he said; he was looking for an empty chamber in the gun and thought he had the cylinder on an empty chamber; his wife came at him and rushed him; he shoved her down, pointed the gun at her head while she was on the floor and fired; he thought the hammer was going to fall on an empty chamber; he denied making threats to kill Carlease although conceding her mother might have had that impression as he had told her if he caught Carlease and the youth together "you are going to read about it." He testified as to finding letters indicating Carlease had been cor-

responding with another man, and as to her being in the company of other men and going with the eighteen year old boy. Appellant had served four years in the Marine Corps and had acted as a security guard at a missile site; he had had rifle and pistol training; he had owned the pistol used in the shooting about ten years.

It was shown that a sample of appellant's blood taken at 11:20 p. m. on the night of the shooting contained a blood alcohol test of 0.115 per cent, and answers to hypothetical questions were given by a pathologist as to possible effect of drinking on mental capacity and judgment under the particular circumstances.

Upon appeal appellant asserts trial errors and illegal sentencing. His first specification is that the prosecution was permitted to offer into evidence over his objection several colored photographs of the body of the deceased and the area in which it was found, the latter revealing blood spots on the floor and bedsheet. The objection was that the death had been testified to previously by officers and was conceded, that the pictures were superfluous and inflammatory and therefore tended to prejudice the jury against appellant. The pictures have not been reproduced in the record. At the time they were offered appellant had pleaded not guilty and it was incumbent upon the prosecution to prove as part of its case in chief all elements of the crime charged. The photographs were relevant to the fact and manner of death. We have considered and rejected in many cases the same argument made by appellant (see *State v. Zimmer*, 198 Kan. 479, 426 P. 2d 267, cert. den. 389 U. S. 933, 19 L. Ed. 2d 286, 88 S. Ct. 298; *State v. Booker*, 200 Kan. 166, 434 P. 2d 801, and cases therein cited) and we must do so again.

Appellant complains of the trial court's refusal to permit him to cross-examine at length Carlease's mother and the sister of the youth with whom Carlease had been associating. Such examination was sought under the guise of testing credibility, that is, showing bias in favor of Carlease and prejudice against appellant. An offer of proof which was made went to the details of that association and was an obvious effort to portray the deceased as an immoral wife. It is no excuse for homicide that the person killed was an immoral person. With certain exceptions where self-defense is an issue evidence of the bad character of the deceased is irrelevant (1 Wharton's Criminal Evidence, Eleventh Ed., § 339; *Wise v. State*, 2 Kan. 419). The trial court did permit sufficient cross-examination of the witnesses to show their relationship to the youth and Carlease, and that

the latter two had been associating together. It did not foreclose appellant from showing any legitimate basis for possible bias or prejudice on the part of the witnesses and appellant was not harmed by the limitation made.

Appellant makes much the same complaint of the court's refusal to permit him to expand his testimony to include evidence involving past misconduct on the part of Carlease prior to the shooting. Here again an offer of proof went to specific instances and particulars of her association with other men. Appellant now suggests this testimony may have been relevant to show heat of passion at the time of the shooting.

This appears to be a complete change of theory from that advanced at trial where appellant's counsel advised the trial court that:

"Number one is that we are not claiming here, and I want to make this perfectly clear, that we have never claimed that this man, Johnson, shot his wife because she had been going out with other men. Our defense in this case, entire case, is that this was an accident."

The trial court limited appellant's testimony because it considered the alleged acts of infidelity too remote in time and because it did not wish the trial to become one of the character of the deceased rather than on the issue of guilt or innocence of homicide.

Appellant did testify generally as to Carlease's misconduct and the jury was fully informed of her past infidelities and indiscretions, being spared only the lurid details. That which has already been said on appellant's preceding complaint is appropriate here. Appellant was not limited in any way from showing his state of mind at the time of the shooting. However, he at no time contended he shot impulsively and without reflection while in the heat of passion —he asserted accident. In *State v. Jones,* 185 Kan. 235, 341 P. 2d 1042, this court defined "heat of passion" as used in our manslaughter statutes as meaning:

". . . any intense or vehement emotional excitement of the kind prompting violent and aggressive action, as rage, anger, hatred, furious resentment, fright or terror. Such emotional state of mind must be of such a degree as would cause an ordinary man to act on impulse without reflection." (Syl. ¶ 2.)

See, also, *State v. Linville,* 148 Kan. 142, 79 P. 2d 869.

In *State v. Jones,* supra, this court quoted approvingly from 40 C. J. S., Homicide, § 42, pp. 902, 903, respecting "heat of passion" as follows:

" 'With few exceptions, an intentional homicide may be reduced from murder to manslaughter only where it was committed in a sudden heat of passion caused by adequate provocation. The requisite passion may be the result of rage, anger, fright, or terror, and must be of such a degree as would cause an ordinary man to act on impulse and without reflection . . .,' " (p. 242)

and from 26 Am. Jur., Homicide, § 44, p. 189, as follows:

" '. . . Voluntary manslaughter is characterized by the doing of the act under the influence of sudden passion without malice. The passion which characterizes voluntary manslaughter does not consist in settled hatred or anything nearly akin thereto; on the contrary, it must be of sudden development. Passion is not limited to rage, anger, or resentment. It may be the emotion expressed by the terms "fear," "terror," or, according to some decisions, "excitement" or "nervousness." This emotional state, however it may be expressed, must actually have dominated the slayer at the time of the homicidal act, and it must have been entertained toward the person slain, and not toward another.' " (p. 242.)

Appellant and Carlease had been separated several months. The proffered testimony referred to events before that separation. The two had since become reconciled despite prior misconduct and there is no suggestion of further provocation. In fact, according to appellant's own testimony her last words were protestations of connubial concord. We see no prejudice to appellant in the ruling made.

The next contention concerns a remark of the trial court made during the opening statement before the jury by appellant's counsel as to what he expected to prove by evidence. Counsel stated his evidence would be appellant had found his wife in a car with two other men and that when he was working double shifts at Goodyear, he discovered his wife was seeing one of his co-workers and that he found the two together in a compromising position. The prosecution objected, whereupon appellant's counsel stated this evidence was only offered to show state of mind at the time the shot was fired. After some discussion in chambers, the court made the following statement to the jury:

"Ladies and gentlemen, I wish to make a ruling on these objections that the county attorney has made so that the jury can better understand the proceedings. The fact that the defendant's wife may have been seeing other men may have caused certain quarrels, anger or heat of passion, which are important in the definition and consideration of manslaughter. It may also be a factor to be considered in connection with determining premeditation and first degree murder. I will let defense counsel proceed with his opening statement, but I will draw the line in presentation of the evidence where I think it's necessary and we'll not permit this trial to become a trial of the deceased's character

which is irrelevant and immaterial and no defense instead of a trial of the defendant. You may proceed."

Appellant argues the court should have made no reference to premeditation or first degree murder. A trial judge in this state may not comment upon the weight of the evidence but we are aware of no prohibition against comment on the scope of evidence so long as the judge does not assume the role of advocate. The trial judge here in his instructions specifically cautioned the jury that in none of his rulings or remarks had he intended to make any suggestion as to how he would resolve any issue of fact. In any event appellant was not convicted of first degree murder; the offense for which he was convicted—murder in the second degree —does not include the element of premeditation. The remarks can hardly be deemed prejudicial.

Appellant next asserts as error the court's refusal to permit him to introduce a written transcript in evidence. It appears that immediately after his oral statement to detectives the night of the shooting appellant gave another statement to the county attorney in the presence of a certified shorthand reporter who made a verbatim transcript of the conversation. Appellant sought to have that transcript, which was held by the county attorney, produced and received in evidence. The court sustained the county attorney's objection to its introduction.

Appellant assigns various reasons why the ruling was error. Passing these for the moment, this court has always been committed to the rule that one seeking reversal of a judgment because of erroneous exclusion of evidence has the burden of demonstrating prejudice, as well as error, in the ruling complained of. Appellant argues the transcript would have shown a different version of events from that shown in the oral statement of appellant as testified to by the detectives, and that appellant was prejudiced when that difference was not made available to the jury. Upon motion for new trial the trial court had this transcript before it; it concluded there was no difference, inconsistency or conflict in any material respect between the transcript and the oral statement shown by the detectives, and, indeed, between appellant's testimony in open court. We have examined the transcript and concur in the trial court's conclusion. Appellant's premise of variance is not borne out. The transcript contained nothing more favorable to appellant than his oral statement. The three versions are virtually identical and appellant suffered no prejudice in the exclusion.

The next complaint is that certain of the court's instructions wherein the term malice was defined or used were defective in that they did not further define and classify malice as either express or implied. We have examined the instructions along with those requested by appellant. Those given were in accord with well-established definitions of malice by this court (see *State v. Donahue*, 197 Kan. 317, 416 P. 2d 287) and were adequate and sufficient under the circumstances of this case.

Appellant also complains about the court's instruction respecting intoxication and the failure to give one requested. Here again we have examined the instruction given and find it proper. The jury was first instructed upon the element of intent requisite to conviction of murder in the second degree and then as to the effect of intoxication upon that intent, fairly covering the subject.

The foregoing matters comprised appellant's motion for new trial. Nothing indicates he was not fairly tried. By its verdict the jury rejected the only defense offered and found him guilty of second degree murder. The sufficiency of the evidence to support that verdict is not challenged. Hence the trial court properly denied appellant another trial.

Finally, appellant contends his sentence of twenty years was illegal. He says it was imposed without benefit of a presentence investigation. He argues it amounts to an increased sentence since it was more than the minimum of ten years established by law (K. S. A. 21-403), and that the imposition of an increase without presentence investigation or evidence of previous conviction was unwarranted and amounted to arbitrary action. Whenever a defendant is convicted of crime the court before whom the conviction is had may request a presentence investigation by a probation officer (K. S. A. 62-2238). However, the use of such investigation is wholly optional with the sentencing court, and the failure to make a presentence investigation has no bearing on the validity of the sentence imposed. Appellant's argument of arbitrary action is untenable. The prosecution recommended a sentence of twenty-five years. Any sentence from ten years up to life imprisonment would have been within authorized limits; the one imposed was legal (*Dunn v. Crouse*, 192 Kan. 180, 386 P. 2d 228; *State v. Akins*, 194 Kan. 514, 399 P. 2d 848).

The judgment of conviction and sentence is affirmed.

APPROVED BY THE COURT.