No. 46,876

State of Kansas, *Appellee*, v. Andrew Leroy Hill, *Appellant*.

(505 P. 2d 704)

Opinion filed January 20, 1973.

*Ralph M. King, Jr.*, of Lawrence, was on the brief for appellant.

*John Mike Elwell*, county attorney, argued the cause, and *Vern Miller*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

Harman, C.: Andrew Leroy Hill was convicted by a jury of the offenses of second degree murder and aggravated battery. His motion for new trial was overruled, he was sentenced to concurrent terms of confinement and he now appeals.

Evidence for the prosecution revealed the following: The offenses occurred on the morning of November 4, 1970, in an apartment building in Lawrence. The principals in the affair were students at Kansas University. Bruce Douglas was killed by .22 caliber rifle fire and his girl friend Paula was wounded at the same time.

The preceding evening Paula had been in Douglas' apartment, assisting him in his school work. Another student, Byron Saunders, shared the apartment with Douglas. Appellant occupied an adjoining apartment and several times during the evening was in and out of Douglas' apartment where Paula was helping Douglas. Paula spent the night with Douglas, retiring about 2:30 a. m., November 4, after engaging in sexual intercourse with him. Appellant was acquainted with Paula, had dated her and on two occasions in October, 1970, had had sexual intercourse with her.

The clothes closet in appellant's apartment adjoined the bedroom in which Douglas and Paula were sleeping. The wall between the two rooms consisted of insulated wallboard through which sound easily traveled.

About 10:00 a. m. Paula was awakened by a shot coming through the wall, followed by a series of shots. She screamed, "Cookie, stop" (appellant's nickname was Cookie). Paula fell off the bed and Douglas fell on top of her. Paula sustained a flesh wound in the shoulder and arm. Douglas was mortally wounded. Shortly before the shooting appellant had turned up his stereo very loud and had told Douglas' roommate Byron to stay in the living room for a couple of minutes. Douglas' roommate had responded to appellant, "Hey man, wait, I have some stuff in the closet".

Following the shooting Douglas was taken to the hospital where he died shortly after admission. Examination revealed at least six pieces of metal in his body. Appellant and Douglas had been good friends. Normally Douglas would not have been in his apartment at the time of the shooting as he had an 8:30 a. m. class.

Police were immediately summoned to the apartment. To the first policeman who arrived at the scene, Officer Schmille, appellant excitedly exclaimed: "Come quick inside, I just shot my best friend, don't let him die". To the officer's query as to what had happened he further stated: "Well it was an accident. I was messing with my gun and it started firing and it wouldn't stop". When the empty gun was found appellant repeated that it had jammed, started firing and wouldn't stop.

To another officer who took appellant first to the hospital and later to the police station, Officer Othick, he made a similar statement. While crying, he said, "I killed my friend". The official who was county attorney at the time of the shooting testified as to a further oral statement made by appellant:

"[He] had been helping a friend move that morning. When he got back to his apartment he looked at his .22 caliber rifle, purchased only a month and a half ago and which he had fired fairly frequently but which had been jamming on him and not operating properly, and thought to himself 'what have I spent my money for on this damn thing?' Then he indicated that he said 'Why it works' and that he pulled the trigger, and when the shot went off he continued to fire about 12 shots. He said he had to pull the trigger to fire each shot and by gesture fluttered his right index finger on the trigger in a rapid way. He was shocked when the gun first went off, in that he didn't know it was loaded, and he described his finger fluttering on the trigger as automatic as opposed to the gun firing automatically. At one point the defendant referred to his finger

as 'jingling' the trigger. When nothing came out he kept jingling saying this damn thing makes me mad. This was when he grabbed it and it went pow pow pow pow pow. Then he heard Byron say cookie cookie you fired and hit Bruce. Whereupon he threw his gun down and ran to Bruce's apartment and grabbed Bruce and said Oh no. The defendant denied ever dating Paula . . ., and said he knew she was in Bruce's apartment the night before. He didn't know if Bruce and Paula had sexual relations, but he assumed they did. He denied having sexual relations with Paula himself. He also did not think the .22 would go through the wall. Besides that he didn't know anyone was in the room because Bruce usually was gone at that time of day. The defendant had been studying all night and was flunking English and psychology classes. The defendant explained he always fired the gun real fast because he liked the sound of it, but it always seemed to jam when firing fast. He did not intend to keep shooting after the first shot went off, but by reflex and habit kept hitting the trigger. It was an automatic reaction."

Police examination revealed a pattern of thirteen bullet holes in the wall of appellant's closet in an area from thirty-six to thirty-nine inches in heighth and spaced in an opening made by pushing clothes on a clothes rack to either side. The angle made by the holes was downward. From the residue of powder marks on the wall it was estimated the gun was fired from a distance of about twenty-four inches. Subsequent test firing of appellant's rifle revealed no jamming. The weapon was semi-automatic, requiring that the trigger be pulled for each shot. Thirteen empty cartridges were recovered, twelve in the corner of the closet and one near the closet door.

At the time of the shooting the automobiles of Paula and Douglas were parked in a parking lot so as to be visible through a window in appellant's apartment.

Appellant testified in his own behalf. He admitted having sexual intercourse with Paula and was aware Douglas had likewise done so but he was not jealous; he was like a brother to Douglas; prior to the shooting he told Byron not to go back into the apartment, that he was going to work with his gun which he thought might go off; he turned up the stereo so that shots would not be heard; he had problems with his landlord and with his schoolwork, and his gun and his stereo hadn't been working right; he tried operating the ejector part of the gun and it wouldn't work; he then pulled the trigger and the gun fired accidentally; thereafter he fired the gun several times, pulling the trigger each time; he was obsessed with his problems and didn't care that he was damaging the landlord's property; he fired from inside the closet, aiming the gun through

the empty space between clothes hanging in the closet; he had no idea anyone was in the next apartment; Douglas and Paula were his friends; when the police questioned him he did not want to answer but they kept hounding him and he said anything to get them to leave him alone; his statements regarding the jamming of the gun were an effort on his part to protect a girl Kate (or Kay) who was present in his room at the time of the shooting.

Further evidence will be mentioned where pertinent to the errors alleged.

Appellant's first specification of error is the trial court improperly permitted the information to be amended after the case had been submitted to the jury. The information initially alleged the shootings were done with a .22 caliber Remington automatic rifle. As indicated, the evidence revealed the weapon was in fact semi-automatic. However, this discrepancy apparently went unnoticed until, after retiring to consider its verdict, the jury sent a note back to the trial judge suggesting that in the information the type of weapon be changed from automatic to semi-automatic. The trial judge first denied but later adopted the suggestion, amending by interlineation both the original information and the copy contained in the instructions.

K. S. A. 1971 Supp. 22-3201 (4) provides:

"The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and is substantial rights of the defendant are not prejudiced."

Appellant argues he was prejudiced by the change because he was charged with first degree murder in which deliberation and premeditation were essential elements and the manner in which the weapon could be operated was crucial. The amendment did not in anywise change the nature of the crime charged. It simply was in accord with the evidence adduced. Appellant, who had been in the military, acknowledged in his testimony that the weapon was not an automatic and could not be fired fully automatically but was in fact semi-automatic in that it was necessary to pull the trigger for each firing. The amendment came as no surprise to appellant and manifestly he was in nowise prejudiced by it.

Appellant's next assertion of error relates to replacement of an ill juror, the story of which is told in the journal entry of judgment:

"THEREUPON, jurors are called to the box by the Clerk of the District Court for voir dire examination. Eleven jurors are excused for cause. The State exercises two peremptory challenges, and the defendant exercises twelve per-

emptory challenges, following which a jury of twelve persons is duly impanelled and sworn to try the case at 1:12 o'clock p. m. The Court recesses.

"THEREUPON, the Court reconvenes at 2:30 o'clock p. m., at which time one juror reports a flare up of illness and the advice of his doctor that he not serve.

"THEREUPON, the defendant does not agree to trying the case to 11 jurors, but agrees to impanelling another juror from those not yet called, it being agreed that each side would have one peremptory challenge.

"THEREUPON, the names of the remaining eligible jurors are placed in a container and six names are selected at random.

"THEREUPON, the Court reconvenes at 3:25 o'clock p. m., and the additional jurors drawn report to the courtroom, the one who is ill having been excused. After the State and the defendant each exercise one challenge, a juror is qualified and passed for cause; and 12 jurors are sworn to try the case at 3:47 o'clock p. m."

The foregoing occurred prior to the opening statement by the prosecution and the introduction of evidence. Appellant now contends no statute authorized the procedure which was followed; therefore, the trial was void. We cannot agree. Appellant not only made no objection at trial, he specifically agreed to that which was done and he is now in no position to complain. Moreover, that which was done was closely analogous to the selection and use of an alternate juror authorized by K. S. A. 43-201 (in effect at the time of appellant's trial but since repealed), and no prejudice inhered in the practice.

Appellant next complains the trial court improperly denied his motion for change of venue. The motion was supported by an affidavit by appellant's trial attorney and was based on stories in the Douglas county news media linking appellant with charges of attempted rape and rape allegedly occurring while appellant was free on bond on the instant charges. The trial court conducted a hearing on the motion but the record on appeal contains nothing beyond the affidavit by counsel plus two newspaper items published February 11, 1971, and February 16, 1971. Appellant's trial commenced May 10, 1971. The affidavit contained only conclusory allegations regarding community prejudice against appellant. Purely evidentiary matters demonstrating inability to secure fair trial were lacking.

K. S. A. 1971 Supp. 22-2616 (1) provides:

"In prosecution in cases of felony, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

Enactment of the foregoing statute has not altered our prior case law on change of venue which was summarized in *State v. Mc-Laughlin,* 207 Kan. 594, 485 P. 2d 1360:

". . . [A] change of venue in a criminal case lies within the sound discretion of the trial court. Before a change of venue to another county can be granted, it must affirmatively appear that in the county in which the cause is pending there exists such prejudice as to make it reasonably certain the defendant will be denied a fair trial. The ruling of the trial court on this question will not be disturbed if supported by competent evidence and if there is no showing of prejudice as to the substantial rights of the defendant. . . .

"The failure of the defendant in a criminal action to present affirmative evidence that prejudice existed in the community so as to make it reasonably certain he could not obtain a fair trial, requires a conclusion that his evidence was totally and completely insufficient to permit the district court to order a change of venue. . . .

"Furthermore, prejudice must be established 'not as a matter of speculation but as a demonstrable reality.'

. . . . . . . . . . . . . . .

"In cases of this nature the state is required to produce no evidence refuting that of the appellant, particularly where the appellant fails to sustain the burden of proof cast upon him to show prejudice in the community." (pp. 597-598.)

Applying the foregoing we find nothing in the record establishing abuse of discretion by the trial court in denying appellant's motion for change of venue.

Appellant asserts the trial court erred in admitting the incriminating statements made by him to police officers and the then county attorney. His various challenges depend on whether he was properly given a Miranda warning prior to their making. The record indicates a suppression hearing not in the presence of the jury was held on the issue of admissibility of these statements but we do not have the benefit of that testimony.

Three separate statements by appellant are involved, the first being that made to Officer Schmille. This officer gave no Miranda warning. The initial statement by appellant that he had just shot his best friend was made in the street in front of the apartment before the officer had even got out of his automobile and was not in response to any question. Clearly this statement was not one elicited through any questioning but was spontaneously and voluntarily made, and as such did not fall within the ban of the Miranda rule (*State v. Law,* 203 Kan. 89, 452 P. 2d 862).

After ambulance attendants had removed the wounded victims appellant led the officer to the Douglas apartment where the officer

inquired, "What happened?", whereupon appellant showed his rifle to the officer and responded as already related.

Under the Miranda rule the critical stage for its application is reached when custodial interrogation begins, that term being defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way (*Miranda v. Arizona,* 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974). *Miranda* points out that its holding is not intended to hamper the traditional function of police officers in investigating crime and that general on-the-scene questioning as to the facts surrounding a crime or other general questioning in the fact finding process is not affected.

Officer Schmille's interrogation clearly constituted general investigatory questioning rather than custodial interrogation and the Miranda warning was not required. (For substantially similar factual situations reaching the same result, see *State v. Phinis,* 199 Kan. 472, 430 P. 2d 251; *State v. Porter,* 201 Kan. 778, 443 P. 2d 360, cert. den. 393 U. S. 1108, 21 L. Ed. 2d 805, 89 S. Ct. 919, and *State v. Frizzell,* 207 Kan. 393, 485 P. 2d 160.)

The second statement challenged is that given to Officer Othick. The contention is that there was no showing appellant understood the warning given or that he voluntarily waived his rights embraced therein. In view of the fact the record on appeal is somewhat ambiguous as to this we have secured and examined the transcript of Officer Othick's testimony. He testified he first saw appellant in his apartment, then took him to the hospital and later to the police station; at the hospital he read the Miranda warning from a card; at first when he started to read appellant was distracted and grief-stricken and did not appear to be listening; he advised appellant he would have to listen and pay attention so he could understand what was being read; appellant was cooperative; the officer read the warning and then asked appellant if he understood what had been read to him and appellant replied that he did; the officer then asked questions to which appellant replied as heretofore related. The record further reveals that shortly after the making of the Othick statement the county attorney gave appellant a card containing the Miranda warning and asked him to read it to ascertain if those were the rights of which he had previously been advised, and appellant acknowledged he had been advised of those rights. From all the foregoing it is abundantly clear appellant was

properly advised of his rights and that he voluntarily and intelligently waived those rights (see *State v. Meeks,* 205 Kan. 261, 469 P. 2d 302).

The third statement involved was that made to the county attorney following the police interrogation. Although further Miranda warnings were given at this stage prior to more questioning, that aspect need not be dwelt upon once it is determined appellant had been properly warned by Officer Othick and that he had effectively waived those rights. In *State v. Boyle,* 207 Kan. 833, 486 P. 2d 849, we held:

"Once law enforcement officers comply with the mandate of *Miranda* by advising one suspected of crime at the threshold of custodial interrogation, the warnings need not be repeated at the beginning of each successive interview." (Syl. ¶ 6.)

Appellant further asserts the best evidence rule was violated when the county attorney was permitted to testify as to his oral statement. The contention is premised on the fact a court reporter was present at the time appellant made the statement and he argues a transcript made by the reporter would have been the best evidence of any statement and that secondary evidence should have been excluded. The contention lacks merit. The best evidence rule, embodied in K. S. A. 60-467, is by its very terms limited to proof of the contents of a writing and was never intended to frustrate proof of an independent oral statement otherwise admissible.

Appellant's specifications of error relating to the admission of his statements cannot be sustained.

Appellant asserts the evidence was insufficient to sustain his conviction. In determining the issue this court looks only to the evidence favorable to the verdict and if the essential elements of the charge are sustained by it the conviction must stand. The evidence need not be repeated nor the matter labored. Admittedly appellant did the shooting. There was evidence from which the jury could have inferred that the shots were not fired either accidentally or haphazardly but were, without just cause or excuse, carefully directed toward an area known to be occupied by the victims. The contention cannot be sustained.

Finally, appellant contends the trial court erred in denying his motion for new trial on the basis of newly discovered evidence. He asserts that if permitted to testify his girl friend Kate (or Kay), who was in his room at the time of the shooting, would have testi-

fied that appellant's intent was to damage his landlord's property. From its very nature this testimony obviously is not newly discovered and no reason is advanced for the failure to produce it at trial. Facts fully within the knowledge of a party at the time of trial cannot later be denominated newly discovered evidence for the purpose of obtaining new trial. Further, before a trial court is authorized to grant new trial on the ground of newly discovered evidence, it must be shown to the court's satisfaction that such evidence could not with reasonable diligence have been produced at the trial (*Davis v. State*, 210 Kan. 709, 504 P. 2d 617).

We find no error in the record and the judgment is affirmed.

APPROVED BY THE COURT.