No. 47,033

STATE OF KANSAS, *Appellee*, v. ALLEN DALE RANDOL, *Appellant.*

(513 P. 2d 248)

Opinion filed June 9, 1973.

*Dennis L. Bieker,* of Dreiling & Bieker, of Hays, argued the cause and was on the brief for the appellant.

*Don C. Staab,* assistant county attorney, argued the cause, and *Vern Miller,* attorney general, and *Simon Roth, Jr.,* county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: Allen Dale Randol appeals from a jury conviction of first degree murder (K. S. A. 1970 Supp. 21-3401). The state sought imposition of the death penalty after a week long trial. The jury determined the punishment to be imprisonment for life as authorized by K. S. A. 1970 Supp. 21-4501 (a). The court entered judgment and sentence in accordance with the jury's verdict.

The charge arose from the murder of Fern Poer, the proprietor of the West Hays Motel in Hays, Kansas. She died from bullet wounds received at the hands of the defendant while he was engaged in an armed robbery.

Numerous points are asserted on appeal by Randol to secure a reversal of the judgment and sentence. The points raised require a chronology of events about which there is little dispute.

Randol had previously been committed to the Colorado State Hospital in Pueblo, Colorado, after an armed robbery committed in Colorado in September, 1970. His committment followed proceedings in a Colorado court in which Randol was found not guilty by reason of insanity. Three and a half months later he escaped through a window of the hospital by filing through bars in a laundry room. By prearrangement he was met on the outside by two acquaintances, Michael G. Wilson and Rebecca Via. The trio traveled to Colorado Springs in Mrs. Via's car.

They left Colorado Springs on January 21, heading for Randol's home in Flint, Michigan. On the way they stopped in Denver, where Randol and Wilson stole a .38 caliber pistol. Mrs. Via purchased a box of cartridges for the pistol. This was verified at the trial for she was required to give certain information to the sales person, including her name, address and date of birth. The trio left Denver on I-70 highway discussing their need for funds to finance the trip to Michigan. The men decided to alleviate this need by using the revolver, and early on the moring of January 22, they stopped outside the West Hays Motel in Hays, Kansas. Randol advised Wilson to keep the car running. Randol donned a jean jacket and hat, grabbed his revolver, "took a deep breath" and headed toward the motel office. Wilson and Via remained in the car. Shortly thereafter Randol returned with slightly more than $60.00 in bills and left behind him the mortally wounded proprietor of the motel, Fern Poer. Randol also shot one of Mrs. Poer's dogs.

The trio then proceeded on their way. Mrs. Poer managed to call the police and was taken to a local hospital where she died.

As the car sped eastward Randol told his confederates of the shooting, divided the money and then cleaned the revolver. They stopped at a highway rest area along the way and Via was instructed by Randol to dispose of the jean jacket and hat he had worn during the robbery. She complied by placing them in a garbage can, from which they were later retrieved by investigating officers. The trio arrived in Michigan and Randol remained with his folks. Wilson and Via made the return trip to Colorado.

Randol kept the revolver and confided to his brother that there had been a shooting. The brother watched while the revolver was hidden behind a rafter in the barn. The revolver was later found by an arresting officer, and it was identified at the trial as the murder weapon.

After Wilson and Via returned to Colorado Springs, quilt-ridden Rebecca Via alerted the Colorado authorities. Wilson and Randol were soon apprehended. Wilson pled guilty to second degree murder. Randol was then tried, and Rebecca Via served as the state's principal witness at the trial.

On appeal Randol contends his motion for a change of venue was improperly denied. The basis for a change of venue in Kansas is governed by a statute which reads:

"In prosecution in cases of felony, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." (K. S. A. 1972 Supp. 22-2616 [1].)

A change of venue in a criminal case lies within the sound discretion of the trial court whose ruling will not be disturbed if there is no showing of prejudice to the substantial rights of the defendant. In *State v. McLaughlin,* 207 Kan. 594, 485 P. 2d 1360, this court held:

"In a criminal action on a motion for change of venue the burden of proof is upon the defendant to make it affirmatively appear that in the county in which the cause is pending there exists such prejudice as to make it reasonably certain the defendant will be denied a fair trial. Failing in such proof the defendant cannot be heard to complain of the trial court's order overruling his motion." (Syl. 1)

In the course of the opinion, the court explained:

"The failure of the defendant in a criminal action to present affirmative evidence that prejudice existed in the community so as to make it reasonably certain he could not obtain a fair trial, requires a conclusion that his evidence

was totally and completely insufficient to permit the district court to order a change of venue. (*State v. Poulos,* 196 Kan. 253, 411 P. 2d 694, cert. den. 385 U. S. 827, 17 L. Ed. 2d 64, 87 S. Ct. 63.)

"Furthermore, prejudice must be established 'not as a matter of speculation but as a demonstrable reality.' (*Woods v. Munns,* 347 F. 2d 948, 951 [10th Cir. 1965].)

. . . . . . . . . . . . . .

"In cases of this nature the state is required to produce no evidence refuting that of the appellant, particularly where the appellant fails to sustain the burden of proof cast upon him to show prejudice in the community. (*State v. Anderson,* 202 Kan. 52, 446 P. 2d 844.)" (p. 597)

See also *State v. Turner,* 193 Kan. 189, Syl. ¶ 5, 392 P. 2d 863; *State v. Lamb,* 209 Kan. 453, 497 P. 2d 275; and *State v. Hill,* 211 Kan. 239, 243, 505 P. 2d 704.

In support of Randol's motion for change of venue he attached two newspaper articles written by a reporter for the local paper. The articles concerned the preliminary hearing of Wilson and Wilson's subsequent plea of guilty to a reduced charge of second degree murder. Randol's participation in the crime was mentioned in each article. No evidence or affidavits were introduced to establish what possible effect this publicity might have had in prejudicing the people of the community. It is true that Hays is a rural community in which homicides rarely occur. It may be assumed that these articles, which appeared in the local newspaper five or six months prior to Randol's trial, were read by residents of the entire community. However, no affirmative evidence that prejudice existed was introduced. The mere publication of newspaper articles does not establish prejudice *per se* that defendant cannot obtain a fair and impartial trial in the county. The trial court properly denied the motion, for prejudice against a defendant does not inevitably and logically flow from the mere publication of two newspaper articles in a local paper.

On defendant's next point it should be noted that prior to the trial defendant filed a motion requesting that he be found incompetent to stand trial. In view of the motion and defendant's personal history, the trial court committed defendant to the state security hospital at Larned for psychiatric examination. Thereafter a hearing was conducted and evidence was introduced, including the testimony of two doctors from Larned and the deposition testimony of three doctors from Colorado. The court found that defendant was competent to stand trial under K. S. A. 1972 Supp. 22-3301 (1) which provides:

"(1) For the purpose of this article, a person is 'incompetent to stand trial' when he is charged with a crime and, because of mental illness or defect is unable:

"(*a*) to understand the nature and purpose of the proceedings against him; or

"(*b*) to make or assist in making his defense."

The defendant's evidence consisted of the deposition testimony of three doctors who examined defendant while he was institutionalized in Colorado. Two of these psychiatrists had not seen defendant for over two years and testified in general as to defendant's psychic abnormalities. The third Colorado psychiatrist had not seen defendant since shortly before his escape from the Colorado State Hospital. None of the Colorado physicians could state without qualification that defendant was incapable of understanding the nature of the charges brought against him or of assisting in his defense at the time the depositions were taken. All three conceded he might have that capability. They simply had not examined him recently enough to be able to offer a firm opinion one way or the other.

The two doctors who testified on behalf of the state examined defendant after the crime and during his commitment at Larned. They testified defendant had an anti-social personality, but when they examined the defendant he was capable of understanding the nature of the charges brought against him and capable of assisting in his defense.

The competence of a defendant to stand trial is determined by his *present* ability to comprehend the nature and purpose of the proceedings against him and to make or assist in making his defense. (*State v. Swinney*, 200 Kan. 404, 436 P. 2d 876; *State v. Brown*, 204 Kan. 430, 464 P. 2d 161.) The trial court was justified in believing the testimony of the only psychiatrists who examined defendant after the crime had been committed. The court's ruling was supported by substantial evidence and will not be overturned on appeal.

Defendant next claims error in the admission into evidence of ten colored slides. These slides depicted the body of the victim and were taken during an autopsy. Defendant contends the slides were inflammatory and were introduced solely to prejudice the minds of the jurors. The state points out that Mrs. Poer was shot five times but still managed to call the police. She lived long enough to be transported to the local hospital. The slides were shown during the

questioning of the district coroner who testified as to the nature and cause of death. The slides served to illustrate his testimony regarding the entry points of the bullets and their trajectory. The pictures confirmed his testimony that Mrs. Poer would probably have been able to call the police after she was shot because her vital organs were not damaged. She bled to death from the bullet wounds.

This court has repeatedly held that the admission of photographs of a decedent, including photographs taken during an autopsy, is not error where the photographs are relevant to matters in issue, such as the fact and manner of death or to assist in understanding a pathologist's testimony. For recent cases, see *State v. Turner,* supra; *State v. Hill,* 193 Kan. 512, 394 P. 2d 106; *State v. Zimmer,* 198 Kan. 479, 426 P. 2d 267, cert. den. 389 U. S. 933, 19 L. Ed. 2d 286, 88 S. Ct. 398; *State v. Booker,* 200 Kan. 166, 434 P. 2d 801, cert. den. 391 U. S. 965, 20 L. Ed. 2d 879, 88 S. Ct. 2031; *State v. Johnson,* 201 Kan. 126, 439 P. 2d 86. Defendant's contention was most recently rejected in *State v. Campbell,* 210 Kan. 265, 500 P. 2d 21, where twenty photographs of the deceased and seven color transparencies were admitted.

In *Campbell* the appellant claimed the exhibits were repetitious, excessive, without probative value and used solely for the purpose of inflaming the jury. The court reviewed the authorities and concluded:

"Exhibits, be they pictures or otherwise, which are relevant and material to the matters in issue, are not rendered inadmissible merely because they may be shocking or gruesome. Where the defendant is charged with a crime of violence, colored slides are relevant and admissible if they tend to establish the violence which was alleged. [Citation omitted.]

"Even though gruesome, photographs properly identified, as representing physical objects which constitute a portion of a transaction which serve to unfold or explain it, may be exhibited in evidence whenever the transaction is under judicial investigation. (*State v. Booker,* 200 Kan. 166, 168, 434 P. 2d 801.) Photographs admitted for the purpose of identifying the victim and to portray the facts described by a pathologist witness concerning the autopsy performed on the body of the victim are relevant and admissible. [Citation omitted.]

"Even where the defendant concedes the victim's death and the cause of death, it is incumbent upon the prosecution to prove as a part of its case in chief all elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death, and the violent nature of the death, and to corroborate the testimony of other witnesses, are relevant and admissible. (*State v. Johnson,* 201 Kan. 126, 129, 439 P. 2d 86; and *State v. Martin,* 206 Kan. 388, 390, 480 P. 2d 50.)

"All of the state's photographic exhibits disputed by the appellant were

relevant to the issues on trial in this case and were admissible. The colored slides were used extensively by Dr. William Eckert, a pathologist, in describing the wounds to the victim's body, the manner and cause of death, and the probable circumstances surrounding the death. Other photographs were offered to show the examination of the victim's body in sequence. Some of the exhibits corroborated the testimony of the state's witnesses." (210 Kan. p. 275.)

When photographic evidence is used by a coroner in describing the wounds in the body and internal organs of the victim, which wounds were received as a result of a crime of violence, such evidence is relevant and admissible to establish material facts, such as the manner and cause of death.

Some of such evidence may be excluded in the discretion of the trial judge if he finds that it is unduly repetitious and offered solely to prejudice the minds of the jurors. See Anno. Evidence, Photograph of Corpse, 73 A. L. R. 2d, § 5, p. 780. Several of the ten colored slides used in this case may correctly be referred to as gruesome but we cannot say that they were unduly repetitious and cumulative or that their introduction was solely for the purpose of prejudice. Thus their admission cannot be said to constitute an abuse of discretion by the trial judge.

Randol contended at the trial he was not guilty by reason of his insanity. The testimony on this point at the trial was given by various psychiatrists and lay people. Defendant claims error in the admission of the testimony of nonexperts on the ground that no proper foundation testimony was required of the witnesses to establish their qualification to give opinions on sanity. A deputy sheriff and two agents of the Kansas Bureau of Investigation (KBI) who took part in the investigation, arrest and encarceration of the defendant testified. Their testimony included personal opinions on defendant's sanity. This was in addition to testimony by seven psychiatrists.

In a general way the deputy sheriff and the two KBI agents testified of their associations with the defendant. Each indicated he had previously observed people suffering from mental disorders on an occasional basis in connection with his work in law enforcement. They testified as to the actions and demeanor of the defendant and each stated the defendant appeared normal and gave no indication to him of any mental disorder.

K. S. A. 60-456 (a) provides:

"If the witness is not testifying as an expert his testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge

finds (*a*) may be rationally based on the perception of the witness and (*b*) are helpful to a clearer understanding of his testimony."

A nonexpert witness may be permitted to testify regarding a defendant's sanity at the time of committing a crime provided the judge finds such opinion appears to be rationally based on the perception of the witness and is helpful to a clearer understanding of his testimony. (*State v. Rumble*, 81 Kan. 16, 105 Pac. 1; *State v. Mendzlewski*, 180 Kan. 11, 299 P. 2d 598; *State v. Coltharp*, 199 Kan. 598, 433 P. 2d 418; *State v. Sagebiel*, 206 Kan. 482, 480 P. 2d 44.)

In *Commercial Travelers v. Barnes*, 75 Kan. 720, 90 Pac. 293, it was held:

"Non-expert witnesses shown to have had especial opportunities of observation are allowed to give opinion evidence of the mental condition of one under investigation in this respect, having first stated the facts upon which such opinions are based, or without stating such facts when opportunity is given to cross-examine in reference thereto." (Syl. ¶ 4)

In *State v. Sagebiel*, supra, this court said:

"The testimony of the nonexpert witnesses who observed the events leading up to the shooting and who described the actions and demeanor of the accused immediately before, during and after the shooting may be considered by the jury along with the testimony from expert witnesses. (*State v. Coltharp*, supra; *State v. Mendzlewski*, supra.) It is the function of a jury to determine the credibility of all witnesses, expert and nonexpert. The sanity of an accused at the time a crime is committed is to be finally determined by the jury if there is substantial evidence, testimony from experts or nonexperts, to support a verdict." (206 Kan. p. 490)

These cases make it clear it is not necessary the witness have any particular training or experience with persons having mental disorders. It is sufficient if the witnesses had a special opportunity to observe the defendant shortly before, during or after the commission of a crime. Here the three lay witnesses all had an opportunity to interview defendant and observe him soon after the offense. Their opinions as to his mental condition were rationally based upon their observation of defendant and were admissible. The witnesses did not express opinions in terms of the ultimate M'Naghten criteria for legal responsibility. Their opinions were simply their impressions of defendant's actions and responses during their discussions and associations with him. Such testimony was relevant and since it was admitted we must assume the judge made the statutory findings requisite to its admission. (K. S. A. 60-456 [*c*].)

Defendant next contends it was error for the court to instruct

the jury on criminal responsibility based upon the M'Naghten rule. The instruction given by the trial court appears to be identical to the instruction on insanity set forth in full in *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, at p. 465. It need not be repeated here. Somewhat oversimplified, the M'Naghten rule on criminal responsibility requires that the defendant understand the nature of his criminal acts and that the acts are prohibited by the laws of the state. The rule was thoroughly examined in *Andrews* and has been approved by this court as recently as 1972 in *State v. Lamb,* 209 Kan. 453, Syl. ¶ 12, 497 P. 2d 275.

It would appear from the testimony of the psychiatrists from Colorado that the Colorado rule for determining criminal responsibility differs substantially from the rule in Kansas. Dr. Hurley testified that in Colorado a defendant is considered criminally insane when he understands the prohibited nature of his act but is unable to resist acting in the prohibited manner because of a diseased mind, *i. e.,* irresistible impulse. The difference in the two rules of criminal responsibility explains the incongruity of an escapee from a mental institution in Colorado being held criminally responsible in Kansas for a crime committed shortly after his escape.

There was substantial competent evidence in the record based upon testimony of the psychiatrists from Larned and of the non-expert witnesses to establish that the defendant knew the nature of his acts and that he knew the difference between right and wrong when he murdered Mrs. Poer. His questionable inability to resist acting in a prohibited manner is of little consequence in Kansas as to his criminal responsibility.

The M'Naghten rule states the proper test in Kansas to determine whether an accused in a criminal action had sufficient mental capacity at the time he committed the crime to be held criminally responsible for his wrongful acts and the rule is adhered to in this appeal. No reason appears in the present case why this court should depart from this test for the defendant with premeditation carefully planned the armed robbery which resulted in the willful and malicious killing of Mrs. Poer. He carried out his plan with deliberation and thereafter attempted to avoid detection by disposing of articles of personal clothing and by hiding the murder weapon.

The defendant next contends that the statute under which he was sentenced is unconstitutional under the recent pronouncement of

the Supreme Court of the United States in *Furman v. Georgia,* 408 U. S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.

In *Furman* the Supreme Court ruled unconstitutional the imposition of the death penalty under Georgia and Texas statutes which authorized juries in criminal cases to choose between the death penalty and life imprisonment in their unbridled discretion. The statutes are similar to the present Kansas statute. The Supreme Court in *Furman* reversed the convictions only insofar as the imposition of the death penalty was concerned and the cases were then remanded for resentencing. Therefore the invalidation of the death penalty provision does not render invalid the underlying conviction. See also *Moore v. Illinois,* 408 U. S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, and *Stewart v. Massachusetts,* 408 U. S. 845, 33 L. Ed. 2d 744, 92 S. Ct. 2845.

The invalidity of the death penalty portion of the Georgia and Texas statutes in the *Furman* decision did not invalidate those portions of their statutes authorizing the imposition of a punishment of life imprisonment. In *Square v. Louisiana,* 408 U. S. 938, 33 L. Ed. 2d 760, 92 S. Ct. 2871, the Supreme Court relied upon both *Furman* and *Stewart,* supra, to vacate the death penalty but remanded the case for further proceedings. On remand, in *State v. Square,* 263 La. 291, 268 So. 2d 229, the Louisiana Supreme Court ordered that Square be sentenced to life imprisonment. See also *Donaldson v. Sack,* Fla., 265 So. 2d 499, where the alternative penalty was imposed.

Our sentencing statute K. S. A. 1972 Supp. 21-4501 (*a*) provides:

"For the purpose of sentencing, the following classes of felonies and terms of imprisonment authorized for each class are established:

"(*a*) Class A, the sentence for which shall be death or imprisonment for life. If there is a jury trial the jury shall determine which punishment shall be inflicted. If there is a plea of guilty or if a jury trial is waived the court shall determine which punishment shall be inflicted and in so doing shall hear evidence;"

It should be noted in this case the jury determined the defendant should be imprisoned for life. The death penalty provided by the statute was not imposed.

After studying the *Furman* decision, including the various concurring and dissenting opinions therein, and the cases which have followed in its wake this court is of the opinion that the death penalty provision of our present statute (K. S. A. 1972 Supp. 21-4501 [*a*]) is constitutionally impermissible. The 1972 Legislature of

Kansas considered but failed to enact amendatory legislation. As a caveat we must point out that a trial court should no longer instruct the jury in a class A felony case that on reaching a verdict of guilty the jury should then determine whether the defendant be punished by death or by imprisonment for life. The jury choice of a death penalty in a class A felony case is no longer constitutionally permissible under K. S. A. 1972 Supp. 21-4501 (a). (Following *Furman v. Georgia,* 408 U. S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.) However, the instruction to the jury in the present case did not constitute prejudicial error since the jury fixed a penalty of life imprisonment.

The defendant's final contention is that this sentencing statute (K. S. A. 1972 Supp. 21-4501 [a].) is constitutionally impermissible because it denies to him the equal protection of the laws and constitutes an unconstitutional delegation of a legislative function. This was not the basis upon which the *Furman* decision rests and with the removal of the death penalty provision as a permissible alternative such a contention is wholly without merit. See *State v. Latham & York,* 190 Kan. 411, 375 P. 2d 788, where similar contentions were examined and rejected by this court prior to the *Furman* decision. The contention is without merit.

The judgment is affirmed.

FONTRON, J., dissenting: The series of ten colored slides or pictures which the state was permitted to exhibit to the jury by projecting them on a screen were taken during the autopsy and were not only gruesome—they were gory, horrible and shocking to a layman's unaccustomed eye. In my opinion the offer of these ten slides could have been for but a single purpose—to inflame the minds of the members of the jury.

The medical testimony was that death occurred from internal bleeding resulting from the five bullet wounds. The external location of the wounds were shown by means of charts and diagrams while the pathologist was testifying. An adequate foundation for medical opinion as to the cause of death was thus provided and the pictures were surplusage at best.

This court has gone a long way in countenancing the introduction of grisly, gruesome photographs, but none so bloody, ghastly or macabre as those depicted on a screen before the jury in this case. The majority opinion does not adequately describe the colored photographs which met the juror's eyes, nor shall I attempt to do so.

I would only say they exceeded in bloody ghastliness any pictures which have come before the court since I have been a member.

I hold no brief for any person who perpetrates an odious crime. I assert, however, that one accused of crime, no matter how monstrous, is entitled to a fair trial conducted in an atmosphere free from poison and prejudice. (See my concurring opinion in *State v. White*, 211 Kan. 862, 508 P. 2d 842.)

The text in 29 Am. Jur. 2d, Evidence, § 260, p. 310, recites:

". . . Even in a criminal case the admission of gruesome evidence does not deny the defendant a fair trial as guaranteed by law. However, evidence which will only serve to prejudice the minds of the jury is properly excluded. . . ."

I recognize that the admission of demonstrative evidence lies largely within the trial court's discretion. In the present case I believe its discretion was abused to the defendant's prejudice.